UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Honeywell International Inc., *Plaintiff*, v. Buckeye Partners, L.P., Buckeye GP, LLC, Buckeye Pipe Line Company, L.P., Buckeye Pipe Line Holdings, L.P., ExxonMobil Oil Corporation, and Exxon Mobil Corporation. *Defendants*. | Civil Action No.__5:18-CV-0646_ (FJS/DEP) **COMPLAINT** |

Honeywell International Inc. ("Honeywell" or "Plaintiff"), by and through undersigned counsel, for its Complaint in this action, alleges the following:

**PRELIMINARY STATEMENT**

1.      Honeywell brings this civil action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*., the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, and New York State law, as set forth below, for costs incurred and to be incurred as a result of releases of petroleum and hazardous substances by Defendants Buckeye Partners, L.P., Buckeye GP, LLC, Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P. (collectively "Buckeye"); and ExxonMobil Oil Corporation, and Exxon Mobil Corporation (collectively "Exxon") (collectively "Defendants") and/or their predecessors into Onondaga Lake, its tributaries, and onto land areas which drain into Onondaga Lake in Onondaga County, New York.

2.      These releases of petroleum and hazardous substances have caused contamination of sediment and surface water in and around Onondaga Lake, contamination of sediment, soil,

and groundwater at state wetland SYW-12, as well as contaminating or otherwise harming fish and other aquatic life, and have caused conditions in and around the Lake that posed, pose, or may pose a threat of harm to the public health and safety.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to sections 113(b) and 113(g)(3) of CERCLA, 42 U.S.C. §§ 9613(b), (g)(3), section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331, 1367.

4.      Venue is appropriate in the Northern District of New York pursuant to 28 U.S.C. § 1391 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened releases of hazardous substances that gave rise to this action occurred or will occur in this district.

## THE PARTIES

5.      Honeywell is a Delaware corporation with its principal place of business at 115 Tabor Road, Morris Plains, New Jersey 07950.

6.      Defendant Buckeye Partners, L.P., is a Delaware corporation with its principal executive offices at One Greenway Plaza, Suite 600, Houston, Texas 77046.

7.      Defendant Buckeye GP, LLC, is a Delaware corporation with its principal executive offices at 100 Matonsford Road, Five Radnor Corporate Center, Suite 500, Radnor, Pennsylvania 19087.

8.      Defendant Buckeye Pipe Line Company, L.P., is a Delaware corporation with its principal executive offices at 5002 Buckeye Road, Emmaus, Pennsylvania 18049-5347.

9.      Defendant Buckeye Pipe Line Holdings, L.P., is a Delaware corporation with its principal executive offices at 5002 Buckeye Road, Emmaus, Pennsylvania 18049-5347.

2

10.   Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P., are subsidiaries of Buckeye Partners, L.P.

11.   Buckeye GP, LLC, is the sole general partner of Buckeye Partners, L.P.

12.   Defendant ExxonMobil Oil Corporation is a New York corporation with its principal executive offices at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298.

13.   Defendant Exxon Mobil Corporation is a New Jersey corporation with its principal executive offices at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298.

14.   Defendant ExxonMobil Oil Corporation operates as a subsidiary of Exxon Mobil Corporation.

## FACTS

### *Onondaga Lake*

15.   Onondaga Lake is located in Onondaga County, New York.

16.   Onondaga Lake is a 4.6-square-mile lake, approximately 4.5 miles long and 1 mile wide, with an average water depth of 36 feet and has two deep basins, a northern basin and a southern basin, that have maximum water depths of approximately 62 and 65 feet, respectively.

17.   For over 100 years, Onondaga Lake received discharges and releases of industrial wastes and wastewaters both directly and through its tributaries.

18.   Sediments in Onondaga Lake became contaminated with a variety of petroleum-related and hazardous substances, including those it received through industrial and sewage discharges, as well as surface runoff and contaminated groundwater discharges.

19.   Numerous contaminants discharged into Onondaga Lake, including, but not limited to, metals, aromatics, chlorinated benzene, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"), were determined by the U.S. Environmental Protection Agency ("EPA") and the New York State Department of Environmental Conservation ("DEC")

3

to create risk to human and ecological receptors.  These contaminants were present in sediment

in Onondaga Lake and are being addressed by remedial actions undertaken by Honeywell.

### *Honeywell's Cleanup of the Onondaga Lake Bottom Subsite*

20.     On June 23, 1989, DEC added Onondaga Lake to the New York State Registry of

Inactive Hazardous Waste Disposal Sites.  On December 16, 1994, pursuant to CERCLA, EPA

listed Onondaga Lake and certain upland areas on the National Priorities List, thereby

designating Onondaga Lake as a Superfund Site.

21.     The Onondaga Lake Bottom has been defined as its own subsite (the "Onondaga

Lake Bottom Subsite") and is also referred to as Operable Unit 2, or OU2.

22.     On June 27, 1989, the State of New York commenced a civil action against

Honeywell's predecessor Allied-Signal Inc. ("Allied-Signal") in the U.S. District Court for the

Northern District of New York under section 107 of CERCLA.  New York v. Honeywell Int'l

Inc., No. 3:89-CV-00815-FJS-DEP.  In its suit, the State sought to compel Allied-Signal to

investigate and remediate contamination in the sediments of Onondaga Lake and in associated

upland areas.

23.     Allied-Signal (and after 1999, Honeywell) undertook a comprehensive Remedial

Investigation and Feasibility Study ("RI/FS") of the Onondaga Lake Bottom Subsite under DEC

oversight.  The RI/FS was completed in November 2004.

24.     On July 1, 2005, DEC and EPA issued a Record of Decision ("ROD") for the

Onondaga Lake Bottom Subsite, which details the selected remedy for the Lake.  Pursuant to the

ROD, the selected remedy includes a mixture of sediment dredging, isolation capping, and thin

layer capping, as well as certain other measures, including the construction of a sediment

consolidation area to contain dredged sediment.  In addition, the ROD requires the

implementation of institutional controls and long-term maintenance and monitoring of the remedy.

25. The ROD estimates the total cost of the selected remedy at $451,000,000.

26. The ROD-estimated costs do not incorporate inflation.

27. On January 4, 2007, the U.S. District Court entered a Consent Decree between DEC and Honeywell in which Honeywell agreed to fund and implement the remedy set forth in the ROD ("2007 Consent Decree") (attached hereto as Exhibit 1).

28. The 2007 Consent Decree provides that "Honeywell shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for 'Matters Addressed' pursuant to and in accordance with this Consent Decree … Furthermore, to the extent authorized under 42 U.S.C. § 9613 (f)(3)(B) or other provisions of CERCLA, by entering into this judicial settlement of liability for the Matters Addressed herein, Honeywell may seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. § 9613 (f)(2)." Ex. 1, ¶ 90.

29. Honeywell completed the dredging required by the ROD in November 2014, one year ahead of schedule. 2.2 million cubic yards of Lake material were dredged.

30. In September 2015, EPA concluded that implementation of the remedy was progressing as expected, and noted that several process enhancements and modifications were implemented by Honeywell to improve overall dredge system performance and production capabilities.

31. Honeywell completed the capping required by the ROD in December 2016. Four hundred seventy-five acres of the Onondaga Lake Bottom Subsite were capped by Honeywell, with more than 3 million cubic yards of material.

32.     Honeywell completed the habitat enhancements required by the ROD in December 2017.

33.     In total, Honeywell has restored about 90 acres of wetlands and planted about 1.1 million native plants on the Onondaga Lake shore and along its tributaries.

34.     Honeywell is required to perform monitoring and maintenance of the remedy and habitat restoration for years to come.

35.     As a result of Honeywell's cleanup, the quality and utility of Onondaga Lake has dramatically improved.

36.     For example, in October 2014, DEC concluded that water quality conditions in the northern two-thirds of the Lake were, for the first time since 1940 (after 55 years), again suitable for swimming.

37.     Audubon New York presented Honeywell with its annual Thomas W. Keesee, Jr. Conservation Award for the cleanup and restoration of Onondaga Lake.  The award announcement highlighted Honeywell's leadership, the ambitious nature of the project, and celebrated the return of the Lake to the Central New York community as a healthy, sustainable asset for future generations.

38.     Various state and local government officials have expressed gratitude regarding the success of the Onondaga Lake cleanup and Honeywell's willingness to perform it.

39.     For example, Onondaga County Executive Joanie Mahoney stated that "Honeywell's willingness to meet and exceed its obligations is the reason why we're standing here today.  I'm very proud to be partnering with them in this cleanup."

40.     Speaking to the cleanup of Onondaga Lake, former DEC Commissioner Joseph Martens stated that "Honeywell has been one of the most progressive and cooperative responsible parties to tackle such a significant environmental problem."

41.     The U.S. Department of Justice ("DOJ"), in a brief filed on behalf of EPA, stated that "while many companies operated at and near [Onondaga Lake] during the 20th Century, Honeywell alone agreed to take responsibility for performing extensive and expensive cleanup work at the Site." Memorandum in Support of Unopposed Request to Enter Consent Decree at 11, United States v. Honeywell Int'l Inc., No. 5:17-cv-01344-FJS-DEP (N.D.N.Y. Feb. 27, 2018), ECF No. 3-1.

### *Honeywell's Payment of EPA's Past Costs*

42.     On December 14, 2017, DOJ filed a civil action under section 107 of CERCLA seeking recovery from Honeywell of costs incurred by the United States in connection with response actions at the Onondaga Lake Superfund Site.

43.     On the same day, DOJ filed a notice of a proposed consent decree that resolves all Honeywell liability for these response costs.

44.     On April 17, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 Response Costs Consent Decree") (attached hereto as Exhibit 2).

45.     The 2018 Response Costs Consent Decree requires Honeywell to pay $7.3 million in reimbursement of response costs incurred by the United States with respect to the Onondaga Lake Superfund Site.

46.     The 2018 Response Costs Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the Complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA,

42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which each Settling Party and each Settling Federal Agency has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)."  Ex 2, ¶28.

47.     Honeywell made the payment required pursuant to the 2018 Response Costs Consent Decree on May 7, 2018.

### *Honeywell's Restoration of Natural Resource Damages*

48.     On December 20, 2017, DOJ filed a civil action under section 107(a) of CERCLA seeking recovery from Honeywell for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

49.     On the same day, DOJ filed a notice of a proposed consent decree that resolves these claims under section 107(a) of CERCLA against Honeywell and Onondaga County for natural resource damages ("NRD") resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

50.     On March 14, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 NRD Consent Decree") (attached hereto as Exhibit 3).

51.     The 2018 NRD Consent Decree provides that Honeywell will (1) implement and maintain 20 restoration projects to restore and protect wildlife habitat and water quality, and increase recreational opportunities at Onondaga Lake; (2) pay $5 million for future restoration projects to be undertaken by the Trustees; (3) pay $500,000 toward stewardship activities to protect and maintain restoration projects; and (4) pay $750,000 for Trustees' future oversight costs.

52. The work and payment obligations under the 2018 NRD Consent Decree are estimated by DOJ to total $26 million.

53. The 2018 NRD Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which each Settling Party has resolved liability to the United States for Natural Resource Damages within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)." Ex 3, ¶82.

54. Honeywell made the payments required under the 2018 NRD Consent Decree on April 10, 2018.

### *Honeywell's Investigation of SYW-12*

55. The SYW-12 property is located at the southern end of Onondaga Lake along the northeastern shoreline of the Lake.

56. The SYW-12 property is bounded by railroad tracks and the former Oil City area to the east, a barge canal to the south, and the Lake to the west.

57. The area is currently approximately 40.7 acres but has been expanded and contracted over time based on Lake depth and deposition of fill material.

58. The area is currently owned by Onondaga County.

59. Neither Honeywell nor its predecessors operated at SYW-12.

60. Nonetheless, Honeywell began investigation at the SYW-12 property in 2006.

61. Neither EPA nor DEC has ever formally concluded that Honeywell is a responsible party at SYW-12.

62.     No administrative or judicial settlement or order explicitly resolves any Honeywell liability for SYW-12.

63.     Honeywell has incurred and anticipates incurring significant costs in the investigation of contamination at SYW-12.

### *The Oil City Area*

64.     Oil City refers generally to a former industrial area in the City of Syracuse located north of the downtown business area.  The area is bounded by railroad tracks to the northeast, a barge canal to the southeast, and an interstate highway to the northwest.

65.     The Lake is located to the west of Oil City and is separated from Oil City by railroad tracks and SYW-12.

66.     The location of Oil City in relation to the Lake, the areas of the Onondaga Lake Bottom Subsite that were subject to dredging and/or capping, and SYW-12 are shown below:



67.     Oil City is comprised of multiple separate tax parcels formerly or currently owned by Defendants and several other oil companies.

68.     The area was used as a bulk petroleum storage and distribution facility by Defendants and/or their predecessors from approximately the late 1910s through the 1990s.

69.     Onondaga Creek historically flowed through the Oil City area.

70.     Onondaga Creek is a tributary of Onondaga Lake.

71.     In 1918, construction of a barge canal began in the Oil City area ("Barge Canal"). The historical Onondaga Creek channel was diverted to the southeast and straightened and widened to allow for barge traffic.

72.     The completed Barge Canal forms the southeastern boundary of the Oil City area and connects the area to the Erie Canal via Onondaga Lake.

73. The Barge Canal facilitated shipment of petroleum products to and from the Oil City area via oil barge through at least the mid-1980s.

74. Three pipelines, two owned by Defendants and/or their predecessors, also transported petroleum products to Oil City.

75. Much of the former Oil City area was redeveloped over the course of the 1990s and early 2000s.  The area is now home to the Destiny USA shopping and entertainment center, which opened in 1990 as the Carousel Center mall, and an Embassy Suites by Hilton hotel, which opened in 2017.

76. Groundwater beneath Oil City flows towards the Barge Canal.

77. The Barge Canal flows into Onondaga Lake.

78. Historically, the Oil City area was broken into various oil terminals, some of which were owned by Defendants.  The following is a map of Defendants' terminals and pipelines:



### *The Oil City Operations*

79.     Defendants' Oil City operations involved the storage and transport of a variety of petroleum products and hazardous substances.

80.     The size and scope of Defendants' Oil City operations increased over time.  The parcel shape and parcel ownership also changed over time.

81.     By 1948, Oil City was the largest oil storage center between Buffalo and Albany.

82.     By the 1980s, Oil City contained 103 petroleum product tanks with 90 million gallons of capacity, and approximately 553 million gallons of product passed through the area each year.

83.     The products stored at Oil City included gasoline (both leaded and unleaded), gasoline additives, diesel, kerosene, number 2 fuel oil, number 4 fuel oil, number 6 fuel oil, lubricating oil, transmix, and hazardous substances.

84.     In addition, the operations resulted in the generation of and necessitated storage and/or disposal of various hazardous wastes, including PCB wastes, ignitable wastes, corrosive wastes, barium, lead, mercury, benzene, tetrachloroethylene, spent halogenated solvents, spent non-halogenated solvents, leaded tank bottoms, methanol, methyl alcohol, waste oils, slop, sludge, and oil/water separator wastes.

85.     Defendants arranged for transport and/or transported these products to Oil City by train, barge, pipeline, and truck.

86.     Transport of product to Oil City arranged by Defendants via barge was dominated by heavier petroleum products, namely number 4 and number 6 fuel oils.

87.     In some years, 100% of the petroleum products transported to and from Oil City via barge were the heavier number 4 and number 6 fuel oils.

88.     Primarily petroleum products were transported to Oil City via pipeline and these included gasoline as well as petroleum products heavier than gasoline, including diesel and fuel oils.

89.     For example, records show that in 1943 alone, just one pipeline, the SOCONY pipeline (owned and operated by a predecessor of Defendant Exxon), transported 10.2 million gallons of fuel oil alone to and from Defendants' Oil City operations.

90.     Stored products were loaded onto trucks by Defendants for delivery throughout the Onondaga Lake basin.

91.     Spills and leaks were inherent to all Defendants' operations at Oil City.

92.     Spills and leaks of petroleum and hazardous substances occurred regularly through many activities at Defendants' operations, including, but not limited to, the following:

        a.   Overfilling tanks, tank trucks, tank cars, barges, and tankers resulting in spills of the various products stored at Oil City;

        b.   Ruptures in tanks/corrosion of tank bottoms resulting in spills of product contaminated with rust, metals, and other hazardous substances;

        c.   Leaks in pipe and valve fittings at pipelines, tanks, and barges;

        d.   Spills from tank bottom cleanout and tank bottom sludge, and oil/water separator sludge disposal;

        e.   Spills from line flushing and pipe/tank changes;

        f.   Leaks from underground storage tanks; and

        g.   Spills and leaks of solvents used to clean equipment.

93.     Intentional releases of hazardous substances also occurred in the ordinary course of Defendants' businesses through the following activities:

    a.   Releases of contaminated water from oil/water separators into the Barge Canal; and

    b.   Upon information and belief, oil barge ballast water dumping.

94.    In just four years, from 1987 to 1991, there were at least 47 reported spills at Oil City.

95.    In addition to documented spills, many undocumented spills and leaks likely occurred.

96.    Indeed, the Defendants and/or their predecessors have long been aware that releases and leakage at storage terminals is a fact of business.

97.    As early as 1916, national petroleum industry trade literature was reporting on the average rates of loss incidental to petroleum storage operation and estimates ranged from 2% to 5% of total throughput.

98.    A 1918 report found that above-ground storage tanks, like those on Defendants' Oil City properties, had an average leakage rate of 0.5% and estimated that leakage accounted for, on average, 40% of the loss resulting from evaporation and leakage combined.

99.    A 1955 study of Loss Control in Transportation and Storage of Petroleum and Petroleum Products found an average estimated loss of 0.4% of petroleum products at bulk plants and terminals.

100.    It was not until the 1970s and 1980s that the full environmental consequences of petroleum and hazardous substance releases became widely understood and releases were regularly documented and/or reported.

101.    Some specific examples of individual Defendants' spills and leaks are discussed below.  However, as a result of these improvements in spill reporting over time, upon

information and belief, far more spills, leaks, and discharges of petroleum and hazardous substances likely occurred at Defendants' Oil City properties prior to the 1970s and went largely or entirely undocumented.

102.    In addition to the spills and leaks on Defendants' Oil City storage terminal land, spills and leaks occurred in the transfer of petroleum products to and from pipelines and to and from barges at the terminals.

103.    As early as 1946, the New York State Department of Health recognized Oil City barge transfer operations in the Barge Canal as an important source of potential pollution and found that as a result of Defendants' operations, large amounts of oil and grease accumulated at the Barge Canal.

104.    In 1947, the New York State Department of Health identified discharges of billage and ballast waters from oil barges as one of the major sources of troublesome black oil soot and miscellaneous debris in Onondaga Lake.

105.    A 1971 study of oil pollution in New York State found that ruptured hose lines, negligent operation of valves and shut-offs, and overpumping often occurred during ship-to-shore or shore-to-ship transfers of petroleum products, like those occurring at Oil City.

106.    Floating oil was observed regularly along the Barge Canal throughout Oil City's history.

107.    Upon information and belief, Defendants arranged for barge transport that resulted in spills and leaks of both petroleum products and hazardous substances directly into Onondaga Lake and its tributaries.

108.    As a result of the leaks and spills on Defendants' Oil City properties and pipelines and from barges, Oil City, Barge Canal, and Onondaga Lake became heavily contaminated.

109.     A 1990 New York Times article referred to Oil City as "an industrial wasteland of oil tanks, junkyards, toxic dumps, and corroded buildings hugging the shore of Onondaga Lake."

110.     The New York Supreme Court, Onondaga County, in a proceeding related to the redevelopment of Oil City, stated that the Oil City area properties "were eyesores to all who traveled in and through the City of Syracuse for a century and beyond" and "[t]he property today continues to be an eyesore to the general public, a detriment to builders of any type of kind, and has caused significant deterioration in and around the area of the immediate North and Northwest part of the City of Syracuse." Destiny USA Dev., LLC v. New York State Dep't of Envtl. Conservation, 19 Misc. 3d 1144(A) at 5-6, 867 N.Y.S.2d 16 (N.Y. Sup. Ct. Onondaga Cnty. 2008), aff'd as mod., 63 A.D.3d 1568, 879 N.Y.S.2d 865 (N.Y. Sup. Ct. App. Div. 4th Dep't 2009).

111.     The New York Supreme Court went on to conclude that "[t]he 'Oil City Parcel' is comprised of approximately 14 separate tax parcels formerly owned by major oil companies, including, among others, CITGO, Exxon Mobil, Sun Atlantic, and others.  Petroleum and hazardous substances, including soils contaminated by petroleum, metals, volatile organic compounds, solvent waste, and PCB's [sic] among other contaminants are present throughout the 'Oil City Parcel' as a result of these prior industrial uses and activities." Id.  It also concluded that "[i]t is undisputed that ground water throughout the 'Oil City Parcel' is also known to be contaminated as a result of these prior industrial uses." Id.

112.     The New York Supreme Court also acknowledged that "contamination entering the lake from groundwater emanating from [Oil City]" contributed to the pollution of Onondaga Lake. Id.

113.    The ROD for the Onondaga Lake Bottom Subsite also specifically identifies Oil City as a contributor of hazardous substances to Onondaga Lake.

### *Defendant Buckeye's Operations*

114.    Buckeye and/or its predecessors owned and operated a major pipeline throughout the Oil City area beginning in the mid-1950s, including ownership and operation of a manifold area located near the barge terminals on the bank of Barge Canal.

115.    In 1953, Buckeye and/or its predecessors extended their pipeline originating in Linden, New Jersey, to service the Syracuse area.

116.    In 1986, Buckeye Pipe Line Company was reorganized as the Buckeye Pipe Line Company, L.P.  The pipeline and manifold area were conveyed to Buckeye Pipe Line Company, L.P., via quitclaim deed.  Defendant Buckeye Pipe Line Company, L.P., is a mere continuation of Buckeye Pipe Line Company and/or otherwise assumed the liabilities of Buckeye Pipeline Company.

117.    Upon information and belief, Buckeye's pipeline serviced the terminals owned by Exxon and/or its predecessors as well as other oil terminals at Oil City.

118.    At Oil City, Buckeye's pipeline was located in the area between the Barge Canal and the oil terminals, along the bank of Barge Canal.

119.    Buckeye's pipeline extended from Oil City, along Barge Canal, to the banks of Onondaga Lake before turning north east, along the border between SYW-12 and railroad tracks.

120.    Both documented and undocumented spills and leaks occurred from Buckeye-owned and -operated pipelines throughout Oil City and along the rest of the pipeline route throughout the Onondaga Lake basin during Buckeye's period of ownership and operation.

121.    For example, in 1998, when a contractor was removing product from the Buckeye pipeline, product accidentally spilled out of the pipeline.

122.     In 1994, excavation of a Buckeye pipeline for pipeline maintenance revealed contaminated groundwater that had not been previously reported.

123.     Similarly, when Buckeye removed its pipelines from the Exxon Terminal in April 2000, contaminated soils were discovered around the line.

124.     In 2004, an underground Buckeye pipeline ruptured near Oil City, spilling number 2 fuel oil into the ground.

125.     In addition to owning and operating the pipeline, in 1983, Buckeye or its predecessors acquired and began operation of a tank terminal at the western end of Oil City, at 401 Hiawatha Boulevard at the intersection of Solar Street ("Exxon/Buckeye Terminal").

126.     Buckeye or its predecessors operated the Exxon/Buckeye Terminal until 1990.

127.     Prior to 1983, the Exxon/Buckeye Terminal was owned and operated by Defendant Exxon's predecessors, discussed further below.

128.     The Exxon/Buckeye Terminal was purchased by Buckeye Tank Terminals, Inc., in 1983.

129.     Buckeye Tank Terminals, Inc., was a subsidiary of the Buckeye Pipe Line Company that, upon information and belief, had no employees of its own.

130.     The Exxon/Buckeye Terminal was operated by the Buckeye Pipeline Company during Buckeye Tank Terminal, Inc.'s period of ownership.

131.     In 1986, Buckeye Tank Terminals, Inc., reorganized into Buckeye Tank Terminals, L.P.  Buckeye Tank Terminals, L.P., was a mere continuation of Buckeye Tank Terminals, Inc. and/or otherwise assumed the liabilities of Buckeye Tank Terminals, Inc.

132.     Buckeye Tank Terminals, L.P., later changed its name to Buckeye Pipe Line Holdings, L.P.

19

133.    The Exxon/Buckeye Terminal consisted of at least eight tanks that were used to store various products, including gasoline, kerosene, diesel, fuel oils, and slop that, upon information and belief, contained hazardous substances.

134.    In 1983, the Exxon/Buckeye Terminal tanks had the capacity to store approximately 6.8 million gallons and had an average throughput of 55,000 gallons per day.

135.    Spills and leaks of petroleum and hazardous substances were documented at the Exxon/Buckeye Terminal during Buckeye and/or its predecessors' ownership thereof.

136.    Upon information and belief, a myriad of additional, undocumented spills and leaks of petroleum and hazardous substances occurred at the Buckeye/Exxon Terminal during Buckeye's and/or its predecessors' ownership and/or operation thereof.

137.    As a result of these spills and leaks, the Exxon/Buckeye Terminal was and is extensively contaminated with petroleum and hazardous substances.

138.    In a 1984 investigation, petroleum impacts were noted in all four soil borings drilled.  Free product was noted in three of four borings.

139.    In a 1986 investigation, six monitoring wells were installed and all showed petroleum impacts.

140.    As a result of these investigations, a free product recovery system was installed on the Exxon/Buckeye Terminal by Defendant Buckeye and/or its predecessors.

141.    However, as of a 1999 investigation, the property was still so contaminated that continued operation of the free product recovery system was recommended.

142.    The Exxon/Buckeye Terminal, along with several other terminals, was included in an area of Oil City DEC designated within the New York State Brownfield Cleanup Program as "Site 6."

143.     In addition to petroleum-related contamination, Site 6 contains metals contamination that exceeds Commercial Soil Cleanup Criteria for arsenic, copper, lead, and mercury.

144.     Groundwater at the Exxon/Buckeye Terminal exceeds regulatory standards for arsenic as well as petroleum-related compounds.

145.     The highest concentration of volatile organic compounds throughout Site 6 were detected at the Exxon/Buckeye Terminal.

### ***Defendant Exxon's Operations***

146.     Defendant Exxon and/or its predecessors owned and operated an approximately 13-acre major on-shore petroleum storage facility, known as the Mobil Terminal facility ("Mobil Terminal"), in the Oil City area.

147.     Defendant Exxon and/or its predecessors owned and operated some portion of the Mobil Terminal from 1907 to 2007 (100 years).

148.     The Standard Oil Company of New York ("S.O.C.O.N.Y.") owned and operated the Mobil Terminal from 1917 until 1931.

149.     In 1931, S.O.C.O.N.Y. changed its name to Socony-Vacuum Corp. and conveyed the Mobil Terminal to Socony-Vacuum Corp.  Socony-Vacuum Corp. was a mere continuation of S.O.C.O.N.Y. and/or otherwise assumed the liabilities of S.O.C.O.N.Y.

150.     Socony-Vacuum Corp. owned and operated the Mobil Terminal until 1934.

151.     In 1934, Soconoy-Vacuum Corp. changed its name to Socony-Vacuum Oil Co. and conveyed the Mobil Terminal to Socony-Vacuum Oil Co.  Socony-Vacuum Oil Co. was a mere continuation of Soconoy-Vacuum Corp. and/or otherwise assumed the liabilities of Soconoy-Vacuum Corp.

152.     Socony-Vacuum Oil Co. owned and operated the Mobil Terminal until 1955.

153.    In 1955, Socony-Vacuum Oil Co. changed its name to Socony Mobil Oil Co., Inc., and conveyed the Mobil Terminal to Socony Mobil Oil Co., Inc.  Socony Mobil Oil Co., Inc., was a mere continuation of Socony-Vacuum Oil Co. and/or otherwise assumed the liabilities of Socony-Vacuum Oil Co.

154.    Socony Mobil Oil Co., Inc., owned and operated the Mobil Terminal until 1966.

155.    In 1966, Socony Mobil Oil Co., Inc., changed its name to Mobil Oil Corporation and conveyed the Mobil Terminal to Mobil Oil Corporation.  Mobil Oil Corporation was a mere continuation of Socony Mobil Oil Co., Inc. and/or otherwise assumed the liabilities of Socony Mobil Oil Co., Inc.

156.    Mobil Oil Corporation owned and operated the Mobil Terminal until 1999.

157.    In 1999, Mobil Oil Corporation merged with Exxon Corporation, resulting in two entities, the Exxon Mobil Corporation and the ExxonMobil Oil Corporation.

158.    In the 1999 merger, the ExxonMobil Oil Corporation assumed the assets and liabilities associated with the Mobil Terminal and, upon information and belief, the SOCONY Pipeline (discussed further below).

159.    The ExxonMobil Oil Corporation continued to own the Mobil Terminal until it was acquired by the Carousel Landing Company, LLC in 2007.

160.    Mobil Terminal operated on three adjacent parcels at the following locations at the eastern end of Oil City: (i) 300 Bear Street; (ii) 301 Bear Street; and (iii) 502 Solar Street.

161.    Mobil Terminal consisted of a distribution terminal and at least 13 above-ground storage tanks with the capacity to hold over 16 million gallons of product.

162.     The Mobil Terminal tanks were used to store various products, including gasoline, diesel, heavy fuel oils, aviation fuel, kerosene, transmix, and slop that, upon information and belief, contained hazardous substances.

163.     Exxon and/or its predecessors also owned and operated a major pipeline (the SOCONY Pipeline) that transported product to the Oil City area.

164.     In addition, from at least 1947 to 1983, Exxon and/or its predecessors owned and operated the Exxon/Buckeye Terminal on the western end of Oil City, separated somewhat from the Mobil Terminal.  That parcel was acquired in 1983 by Defendant Buckeye.

165.     From 1927 until 1928, the Beacon Oil Company owned and operated the Exxon/Buckeye Terminal.

166.     In 1928, Beacon Oil Company merged with Colonial Oil Company to form the Colonial Beacon Oil Company.

167.     From 1928 until 1947, the Colonial Beacon Oil Company owned and operated the Exxon/Buckeye Terminal.

168.     In 1947, the Standard Oil Company of New Jersey purchased the Colonial Beacon Oil Company and all of its assets, including the Exxon/Buckeye Terminal.

169.     From 1947 until 1972, the Standard Oil Company of New Jersey owned and operated the Exxon/Buckeye Terminal.

170.     Upon information and belief, the Standard Oil Company of New Jersey expressly or impliedly assumed the assets and liabilities of the Colonial Beacon Oil Company and/or was a mere continuation thereof.

171.     In 1972, the Standard Oil Company of New Jersey changed its name to Exxon Corporation and conveyed the Exxon/Buckeye Terminal to Exxon Corporation.  Exxon

Corporation was a mere continuation of the Standard Oil Company of New Jersey and/or otherwise assumed the liabilities of the Standard Oil Company of New Jersey.

172.    Exxon Corporation continued to own and operate the Exxon/Buckeye Terminal until it was conveyed to Buckeye in 1983.

173.    Following the 1983 sale to Buckeye, many of the tanks located at the Exxon/Buckeye terminal still contained Exxon-owned product.

174.    Upon information and belief, in the 1999 merger, the Exxon Mobil Corporation assumed the assets and liabilities associated with the Exxon/Buckeye Terminal.

175.    As discussed above, the Exxon/Buckeye Terminal consisted of at least eight tanks that were used to store various products, including gasoline, kerosene, diesel, heavy fuel oils, and slop that, upon information and belief, contained hazardous substances.

176.    Storage tanks and pipelines at the Mobil and Exxon/Buckeye Terminals often leaked petroleum, kerosene, diesel, gasoline, and hazardous substances into the soil.

177.    In addition to leaks, there were frequent spills.

178.    For example, there were at least 13 reported spills of petroleum, kerosene, diesel, and gasoline at the Mobil Terminal between 1990 and 1998 alone, including one spill of 3,000 gallons of gasoline in 1995 caused by a pipeline malfunction.

179.    Numerous other spills occurred at Exxon and/or Mobil gas service stations and from the SOCONY pipeline across the Onondaga Lake basin during this time period.

180.    Upon information and belief, many unreported spills occurred.

181.    Some of these unreported spills are known.

182.    For example, in 1925, a fire that "roared" for 36 hours in the Oil City area was started by a spark from a metal pick in the hands of a man in a water main trench into which

flowing gasoline had found its way.  The source of the gasoline was a leak in the tank of one of Exxon's predecessors at the Mobil Terminal.

183.    Similarly, in 1988, "wide spread" contamination was found on and off site at the Mobil Terminal, including areas of free product.

184.    In 1988, Exxon's predecessor was cited for failing to notify the fire department of a petroleum spill at the Mobil Terminal.

185.    Upon information and belief, in addition to the spills and leaks described above, a myriad of additional spills and leaks of petroleum and hazardous substances occurred at Exxon's and/or its predecessors' Oil City facilities during Exxon's and/or its predecessors' ownership and/or operation thereof.

186.    For example, a 1970 investigation by the Syracuse Fire Department found that pits in the Mobil Terminal yard showed evidence of oil product which employees stated could be a result of "old spills," "product line leak," or "tank leaks."

187.    As a result of these spills and leaks, the Mobil Terminal and, as discussed above, the Exxon/Buckeye Terminal became contaminated with petroleum and hazardous substances.

188.    In a 1988 investigation of the Exxon Terminal, petroleum impacts were observed in at least 3 of 4 borings collected.

189.    As part of the New York State Brownfield Cleanup Program, DEC designated portions of the Exxon Terminal as "Site 8" and "Site 9."

190.    Analytical results from the Remedial Investigations at both Sites 8 and 9 are currently under review by DEC.

191.    Upon information and belief, these analytical results will show that Sites 8 and 9 continue to be contaminated with both petroleum and hazardous substances.

### *Contaminants Associated with Defendant's Oil City Operations*

192. Defendants' Oil City petroleum products, operations, and wastes contain a variety of contaminants.

193. PAHs are one of the most important contaminants potentially resulting from spills and leaks from the Defendants' operations, including the Defendants' petroleum products.

194. Heavier petroleum products persist in the environment because they contain higher molecular weight PAHs.

195. While all PAHs spilled and/or leaked by Defendants may be harmful to human health and/or the environment and have likely contributed to Honeywell's need to remediate the Onondaga Lake Bottom Subsite, higher molecular weight PAHs are more persistent in the environment than lighter molecular weight PAHs.

196. Diesel and number 2 fuel oil are heavier petroleum products than gasoline.

197. Number 4 fuel oil is heavier than number 2 fuel oil.

198. Number 6 fuel oil is heavier than number 4 fuel oil.

199. Defendants transported, arranged for transport, and stored large volumes of these heavier PAH-containing products.

200. Permit renewal records show that in the 1980s, a total of over 70 million gallons of product at least as heavy as number 2 fuel oil passed through the Oil City area on an annual basis.

201. From 1918 to 1980, an estimated 900 million gallons of products at least as heavy as number 2 fuel oil passed through the Oil City area.

202. It is estimated that over 17.5% of the spills and leaks that occurred at Oil City were spills or leaks of the higher molecular weight PAH products.

203.    In addition to contaminants spilled or leaked through petroleum products or wastes, Defendants also spilled or leaked contaminants contained in non-petroleum hazardous substances.

204.    For example, chlorinated volatile organic compounds ("VOCs"), which are not a constituent found in petroleum products, have also been found in the soil and/or groundwater at Oil City.

205.    The chlorinated VOCs found at Oil City include carbon tetrachloride, chlorobenzene, methylene chloride, trichloroethylene ("TCE"), vinyl chloride, 1,3-butadien, 1,4-dichlorobenzene, 1,1-dichloroethane, 1,2-dichloroethane, 1-3-dichloroethene, tetrachloroethylene, and 1,2,4-trichlorobenzene.

206.    DEC has identified at least the following as current or pre-remediation contaminants of concern in the Oil City area: 1,2,4-trimethylbenzene, arsenic, barium, benzene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)flouranthene, benzo(k)flouranthene, butylbenzenes, cadmium, chlorobenzene, chromium, chrysene, copper, dibenz[a,h]anthracene, ethylbenzene, indeno(1,2,3-CD)pyrene, lead, manganese, mercury, methyl tert-butyl ether, naphthalene, n-propylbenzenes, PCB (Aroclor 1260), propylbenzenes, petroleum products, phenanthrene, TCE, trimethylbenzenes, zinc, and xylenes.

### *Pathways from Defendants' Facilities to Onondaga Lake and SYW-12*

207.    Much of the environmental contamination resulting from leaks and spills at Defendants' Oil City properties and from oil barges and Defendants' pipelines made its way to the Lake through various pathways.

208.    Contaminants spilled or leaked into sanitary sewers on Defendants' Oil City properties were transported to the publicly owned treatment plant called Metro.

209.     Metro was located on the southern bank of Onondaga Lake and discharged contamination, including a portion of the contamination it received from Defendants' Oil City properties, directly into the Lake.

210.     In 1971, there was so much petroleum product and waste accumulated in the sanitary sewers on and around the Oil City properties that explosive conditions existed.

211.     Contaminants spilled or leaked into storm sewers on Defendants' Oil City properties were discharged directly into the Barge Canal.

212.     As early as 1928, petroleum wastes were discovered flowing over the ground and into the Barge Canal from Oil City.

213.     In 1966, the New York State Department of Health was so concerned with Oil City's discharges to the Barge Canal/Onondaga Creek that it ordered the hiring of a consultant specifically to study oil pollution resulting from discharges to the sewer system by the Oil City tank farms.

214.     A portion of contaminants spilled or leaked into the subsurface of Defendants' Oil City properties or elsewhere in the Onondaga Lake basin were transported through groundwater and/or non-aqueous phase liquid directly to the Lake and/or to the Barge Canal.

215.     Samples collected by the New York Thruway Authority in 2016 show that to this day, more than 20 years since Defendants' Oil City operations ceased, the Barge Canal is still heavily contaminated with PAHs.

216.     Within Barge Canal, higher concentrations of PAHs occur at deeper sample intervals (*i.e.*, deeper in the sediments).

217.     Given the hydrodynamics and environment of the Barge Canal, impacts that occurred earlier in time are more likely to be present in deeper sediments.

28

218.     The existence of higher PAH concentrations in the deeper sediments of Barge Canal confirms that more petroleum-related contamination was contributed earlier in the history of Barge Canal (*i.e.*, during the height of Oil City's operations).

219.     The concentrations of PAHs at the deeper sample intervals within Barge Canal are higher than the pre-dredge concentrations of PAHs in the Onondaga Lake Bottom Subsite.

220.     A portion of Defendants' contaminants that were discharged to the Barge Canal were transported through the sediments of the Barge Canal directly into the Lake.

221.     A portion of Defendants' contaminants that were discharged to the Barge Canal were also dredged from the sediments of the Barge Canal and deposited in the Lake or on SYW-12.

222.     The Barge Canal was dredged on a regular basis throughout Oil City's history.

223.     This dredge material was deposited on the SYW-12 area and in Onondaga Lake. As a result, the contamination Defendants contributed to Barge Canal sediments were transported from Barge Canal directly to SYW-12 and the Lake.

224.     In the 1940s, dredging of the Barge Canal was necessary every three or four years, and the dredged silt was pumped to a swampy part of the shore of Onondaga Lake near the Barge Canal terminal, presumably SYW-12.

225.     A 1946 New York State Department of Health report acknowledges that dredge material from the Barge Canal was pumped to the shore of the southeast corner of the Lake where unsightly, black, odorous sludge banks were formed.

226.     The 1946 report includes a map showing the location of where this dredge was deposited, and the area is the location of SYW-12.

227.    A 1947 memorandum by the New York State Department of Health found that Onondaga Lake was visibly polluted with foreign material affecting at times over half of the area of the Lake and including oil, grease, soot, debris and both floating and suspended solids of sewage and industrial origin.  The 1947 memorandum specifically pointed to dredge spoils from the Barge Canal as a source of the Lake pollution.

### *Contamination in the Lake Resulting from Oil City Discharges*

228.    As a result of discharges from Defendants' Oil City operations and transport to Onondaga Lake through the various pathways discussed above, the Lake became heavily contaminated with petroleum products, petroleum wastes, and other hazardous substances.

229.    While there were other sources of industrial contamination to the Lake, most of the contamination found in the areas of the Lake adjacent to Oil City, Barge Canal, and SYW-12 originated from Oil City, including Defendants' operations and facilities.

230.    For example, the ROD concluded that one of the areas with the highest concentration of high molecular weight PAHs was the area off the former Oil City shoreline.

231.    The Onondaga Lake Bottom Subsite remediation area directly adjacent to the Oil City area and SYW-12 and into which Barge Canal discharges is referred to as Sediment Management Unit 6 ("SMU 6").

232.    PAHs are the predominant remedial driver in SMU 6.

233.    PAHs contributed significantly to the need to remediate in 100% of the areas in SMU 6 requiring remediation.

234.    Anthropogenic PAHs in the environment fall into two predominant categories: petrogenic and pyrogenic.

235.    Petrogenic PAH contamination results from petroleum products and petroleum wastes, whereas pyrogenic PAHs result from combustion of materials such as oil, coal, and vegetation.

236.    When compared against petrogenic and pyrogenic signatures, the PAHs present in SMU 6 overwhelmingly show a petrogenic, or petroleum-based, signature.

237.    This suggests the PAH contamination in SMU 6 is primarily a result of petroleum products and wastes leaked or spilled into the environment.

238.    Defendants and/or their predecessors were major operators within the Oil City area.

239.    The location, concentrations, and forensic composition of PAHs in SMU 6 confirm that Oil City operations, including Defendant's operations, are the predominant source contributing to the need to remediate that area of the Lake.

240.    Defendants' contamination also contributed to the need to remediate other areas of the Onondaga Lake Bottom Subsite.

### *Contamination of SYW-12*

241.    Reports confirm that in 1946, dredged material from the Barge Canal was pumped from the Barge Canal bottom to the SYW-12 area and unsightly, black, odorous sludge banks were formed.

242.    Upon information and belief, material dredged from the Barge Canal was pumped from the Barge Canal and deposited on SYW-12 in many additional years.

243.    As a result of this pumping and deposition, contaminants present in the Barge Canal were transported directly to SYW-12.

244.    These contaminants include contaminants contributed to the Barge Canal by Defendants' Oil City operations.

245.    It is also possible that Defendant Buckeye's pipeline, which bordered SYW-12, contributed directly to the contamination at SYW-12.

246.    Honeywell's investigations have revealed stained soils with petroleum odors and oil sheen on groundwater.

247.    PAHs were detected in every surface soil sample collected at SYW-12.

248.    In addition to PAHs, contaminants detected at SYW-12 include chlorinated benzenes, benzene, toluene, ethylbenzene, xylene, carbon disulfide, 2-butanone, methylene chloride, acetone, PCBs (Aroclor 1254 and 1260), cadmium, copper, lead, mercury, zinc, nickel, chromium, beryllium, silver, and arsenic.

249.    When compared against petrogenic and pyrogenic signatures, the PAHs present at SYW-12 suggest contributions from both petrogenic and pyrogenic sources, meaning a portion of the PAH contamination is from petroleum sources.

250.    The location, concentrations, and forensic composition of PAHs in SYW-12 confirm that the Oil City operations are the predominant source of petrogenic PAHs at SYW-12.

251.    Defendants contributed a major portion of the Oil City petrogenic sources that came to rest in SYW-12.

252.    In addition, the location, concentrations, and/or forensic composition of BTEX and chlorinated benzene contaminants on SYW-12 suggests that the Oil City operations are the source of at least some of these contaminants on SYW-12.

### ***Procedural History/Prior Negotiations Regarding These Claims***

253.    Buckeye entered a tolling agreement with Honeywell on December 18, 2009, and has agreed to toll the claims asserted herein until June 1, 2018.

254.    The tolling agreement entered between Honeywell and Buckeye provides that the agreement is binding upon "their respective parent companies, subsidiaries, predecessors, successors, and assigns, including but not limited to Buckeye Pipeline Company."

255.    Exxon initially refused to enter a tolling agreement with Honeywell with regard to these claims.

256.    On January 4, 2010, Honeywell filed a complaint against Exxon asserting claims pursuant to CERCLA, OPA, and New York State law for "costs incurred or to be incurred as a result of releases of hazardous substances by Exxon Mobil and/or its predecessors into Onondaga Lake, its tributaries, and onto land areas which drain into Onondaga Lake."  Complaint, *Honeywell Int'l Inc. v. Exxon Mobil Corp.*, No. 5:10-cv-0008 (N.D.N.Y. Jan. 4, 2010), ECF No. 1.

257.    Exxon entered a tolling agreement with Honeywell on March 24, 2010.

258.    As a result of Exxon's willingness to enter a tolling agreement, Honeywell voluntarily dismissed its suit against Exxon without prejudice on March 24, 2010.

259.    Exxon agreed to toll the claims asserted herein from January 4, 2010 until June 1, 2018.

260.    The tolling agreement entered between Honeywell and Exxon provides that the agreement is binding as to Defendants' "parent companies, subsidiaries, predecessors, successors, and assigns, including but not limited to, Standard Oil Company, and Mobil Oil Corporation."

261.    Honeywell initially presented the full detail of these claims to Defendants and Other Oil City Parties in 2013.

262.     Despite five years of intensive negotiations, Defendants have denied or unreasonably minimized their liability, and the parties have failed to reach a settlement of these claims.

## COUNT ONE

## CERCLA COST RECOVERY CLAIM FOR SYW-12 RESPONSE COSTS

263.     Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

264.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that:

" … (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; [or] (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances … shall be liable for— …any…necessary costs of response incurred by any other person consistent with the national contingency plan."

265.     Defendants and Honeywell are "persons" within the meaning of section 101(21),107(a), 113(f)(1), and 113(f)(3)(B) of CERCLA, 42 U.S.C. §§ 9601(21), 9607(a), 9613(f)(1), 9613(f)(3)(B).

266.     Defendants' Oil City properties, terminals, and pipelines, sewers, pipes and tributaries to Onondaga Lake, and Onondaga Lake are all "facilities" within the meaning of sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9607(a).

267.     Hazardous substances were "disposed" of at Defendants' facilities, within the meaning of sections 101(14), 101(29), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), (29), 9607(a).

268.    There were "releases" and/or "threatened releases" of "hazardous substances" into the environment at and from the facilities, as those terms are defined in CERCLA sections 101(8), (9), (14), (22), and 107(a), 42 U.S.C. §§ 9601(8), (9), (14), (22), and 9607(a).

269.    At the time of the disposal and releases of hazardous substances, Defendants and/or their corporate predecessors were "owners," and/or "operators," of one or more facilities, including their Oil City properties, terminals, and pipelines, within the meaning of section 101(20) and 107(a) of CERCLA, 42 U.S.C. § 9601(20), 9607(a).

270.    Defendants arranged for disposal of hazardous substances owned or possessed by Defendants and other parties at one or more facilities, including, but not limited to, Defendants' and others' Oil City properties, terminals, pipelines, sewers, pipes, and tributaries to Onondaga Lake, the Onondaga Lake Bottom Subsite, and SYW-12, within the meaning of section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

271.    Defendants' disposal and releases of these substances have contributed hazardous substances to SYW-12.

272.    Honeywell has incurred, and will continue to incur, "necessary costs of response . . . consistent with the national contingency plan" in the course of its investigation of SYW-12. 42 U.S.C. § 9607(a)(4)(B).  These costs were incurred voluntarily by Honeywell.

273.    Accordingly, Defendants are each jointly and severally liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating SYW-12.

274.    Section 113(g)(2) of CERCLA, 42 U.S.C § 9613(g)(2), provides that for cost recovery actions pursuant to Section 107, 42 U.S.C. § 9607, where future costs are anticipated,

"the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

275.    Honeywell will continue to incur response costs in investigating the environmental contamination at SYW-12, and these costs are recoverable pursuant to section 107 of CERCLA, 42 U.S.C. § 9607.  A declaratory judgment is therefore appropriate defining Defendants as jointly and severally liable for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT TWO

## CERCLA CONTRIBUTION CLAIM FOR RESPONSE COSTS

276.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

277.    Defendants' disposal and releases have contributed hazardous substances to the Onondaga Lake Superfund Site and, more specifically, have contributed hazardous substances to the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12.

278.    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 . . . or under section 9607(a)."

279.    Additionally, section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or

judicially approved settlement may seek contribution from any person who is not party to [the] settlement."

280.    In the 2007 Consent Decree, Honeywell resolved its liability to the State of New York for some or all of the costs of the Onondaga Lake Bottom Subsite RI/FS and the ROD remedy, both of which constitute response actions within the meaning of CERCLA Section 101(2), 42 U.S.C. § 9601(25).

281.    The 2007 Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

282.    Furthermore, all the costs Honeywell has incurred, and will incur, pursuant to the 2007 Consent Decree constitute necessary costs of response incurred consistent with the National Contingency Plan ("NCP") under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

283.    In the 2018 Response Costs Consent Decree, Honeywell resolved its liability to the United States for its costs incurred in overseeing the investigation and remediation of the Onondaga Lake Bottom Subsite, which constitute response actions within the meaning of CERCLA.  42 U.S.C. § 9601(25).  The 2018 Response Costs Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

284.    Furthermore, all the costs Honeywell has incurred pursuant to the 2018 Response Costs Consent Decree constitute necessary costs of response incurred consistent with, and not inconsistent with, the NCP under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

285.    Defendants are liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating the Onondaga Lake Bottom Subsite and in investigating SYW-12.

286.    Defendants were not party to the 2007 Consent Decree nor the 2018 Response Costs Consent Decree.

287.    Accordingly, Defendants are liable to Honeywell under Section 113 of CERCLA for an equitable share of the necessary costs of response incurred by Honeywell, consistent with the NCP, with regard to the Onondaga Lake Bottom Subsite and SYW-12, including costs incurred pursuant to the 2007 Consent Decree and the 2018 Response Costs Consent Decree.

288.    The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

289.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake.  Honeywell will continue to incur costs pursuant to the 2007 Consent Decree and in the investigation of SYW-12.  A declaratory judgment is therefore appropriate defining Defendants' liability for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT THREE

## CERCLA CONTRIBUTION CLAIM FOR NRD COSTS

290.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

291.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that "any person who at the time of disposal of any hazardous substance owned or operated any

facility at which such hazardous substances were disposed of" shall be liable "for . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

292.    All Defendants' disposals and releases have contributed hazardous substances that caused injury to, destruction of, or loss of natural resources at the Onondaga Lake Superfund Site.

293.    In the 2018 NRD Consent Decree, Honeywell resolved its liability to the Onondaga Lake Trustees for some or all of the NRD at the Onondaga Lake Superfund Site.  The 2018 NRD Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).  Furthermore, the costs Honeywell has incurred, and will incur, pursuant to the 2018 NRD Consent Decree constitute payment for NRD costs under section 107(a)(4)(c) of CERCLA, 42 U.S.C. § 9607(a)(4)(C).

294.    Defendants are liable under section 107 of CERCLA, 42 U.S.C. § 9607, for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, resulting from the releases of hazardous substances at or from defendants' facilities at the Onondaga Lake Superfund Site.

295.    No Defendant was party to the 2018 NRD Consent Decree.

296.    Accordingly, all Defendants are liable to Honeywell under section 113 of CERCLA, 42 U.S.C. § 9613, for an equitable share of the costs incurred by Honeywell pursuant to the 2018 NRD Consent Decree.

297.    An actual controversy currently exists between Honeywell and all Defendants with regard to Defendants' liability for the costs that Honeywell has incurred in connection with the 2018 NRD Consent Decree.  Honeywell will also continue to incur NRD costs in connection

with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining

Defendants' liability for these future costs that will be binding in any subsequent action or

actions that Honeywell may bring to recover NRD costs against Defendants.

## COUNT FOUR

## OPA CONTRIBUTION CLAIM

298.    Honeywell repeats and incorporates herein by reference the allegations of all of

the foregoing paragraphs.

299.    Section 1002 of OPA, 33 U.S.C. § 2702, provides in pertinent part, as follows:

> Notwithstanding any other provision or rule of law, and subject to the provisions
> of this Act, each responsible party for a vessel or a facility from which oil is
> discharged . . . into or upon the navigable waters or adjoining shorelines or the
> exclusive economic zone is liable for . . . any removal costs incurred by any
> person . . . which are consistent with the National Contingency Plan . . . [and]
> [d]amages for injury to, destruction of, loss of, loss of use of, natural resources,
> including the reasonable costs of assessing the damage.

300.    Honeywell is a "person" within the meaning of sections 1001(27), 1002, and 1009

of OPA, 33 U.S.C. §§ 2701(27), 2702, 2709.

301.    Honeywell has incurred removal costs consistent with the NCP, as defined by

section 1001(19) of OPA, 33 U.S.C. § 2701(19), and NRD costs at the Onondaga Lake

Superfund Site, including the Onondaga Lake Bottom Subsite and SYW-12.

302.    The Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and

SYW-12 include navigable waters and adjoining shorelines, as defined in section 1001(21) of

OPA, 33 U.S.C. § 2701(21).

303.    All Defendants are responsible parties, as defined in section 1001(32) of OPA, 33

U.S.C. § 2701(32).

304.    All Defendants owned or operated "facilities" from which oil was discharged into the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12, within the meaning of sections 1001(9) and 1002 of OPA, 33 U.S.C. §§ 2701(9), 2702.

305.    Defendants' discharges and releases of oil resulted in injury to, destruction of, loss of, and/or loss of use of, natural resources.

306.    Defendants are liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for oil-related removal costs incurred consistent with the NCP, and not inconsistent with the NCP, at the Onondaga Lake Bottom Subsite and SYW-12.

307.    All Defendants are liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for damages for injury to, or economic losses resulting from destruction of, loss of, and/or loss of use of, natural resources, including the reasonable costs of assessing the damage.

308.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at the Onondaga Lake Superfund Site and SYW-12 and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at the Onondaga Lake Bottom Subsite.  Honeywell will also continue to incur response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT FIVE

## NEW YORK NAVIGATION LAW CONTRIBUTION CLAIM

309.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

310.    Section 181(1) of the New York Navigation Law ("Act"), N.Y. Nav. Law § 181(1), provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained."

311.    All Defendants and their predecessors are "persons" who "discharged" "petroleum," as those terms are defined by N.Y. Nav. Law §§ 172(14), (8), and (15), at the Onondaga Lake Bottom Subsite and SYW-12.

312.    All Defendants' "petroleum" "discharges" at Onondaga Lake and SYW-12 were into the waters of the State of New York and/or onto lands from which the discharges might flow or drain into those waters.

313.    Defendants' petroleum discharges caused direct and indirect damages to the natural resources of Onondaga Lake.

314.    A portion of the costs Honeywell has incurred and will incur pursuant to the 2018 NRD Consent Decree are direct or indirect damages caused by Defendants' petroleum discharges.

315.    Section 176(8) of the Act, N.Y. Nav. Law § 176(8), provides that "every person providing cleanup, removal of discharge of petroleum . . . pursuant to this section [of the Act] shall be entitled to contribution from any other responsible party."

316.    Section 181(2) of the Act, N.Y. Nav. Law § 181(2), defines "cleanup and removal costs" to include "[t]he cost of restoration and replacement, where possible, of any natural resource damaged or destroyed by a discharge."

317.    All Defendants are "responsible parties" under N.Y. Nav. Law § 176(8) with regard to the petroleum discharges at Oil City.

318.    Honeywell is a "person" that has incurred, and will continue to incur, "cleanup and removal" costs, as that phrase is defined by N.Y. Nav. Law § 172(5), at the Onondaga Lake Bottom Subsite and SYW-12, which were undertaken with the approval of DEC.

319.    Honeywell's actions related to the "cleanup and removal" of "petroleum" at the Onondaga Lake Bottom Subsite and SYW-12 have been in accordance with the NCP, codified at 40 C.F.R. Part 300, and as required by N.Y. Nav. Law § 176(4).

320.    Defendants are liable to Honeywell for contribution of the costs of cleanup and removal of petroleum discharges that Honeywell has incurred, and will continue to incur, with respect to the investigation and remediation of the Onondaga Lake Bottom Subsite and the investigation of SYW-12.

321.    All Defendants are liable to Honeywell for contribution of NRD costs incurred pursuant to the 2018 NRD Consent Decree.

322.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response

costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs in connection with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT SIX

## STATE LAW CONTRIBUTION CLAIM

323.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

324.    Section 1401 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 1401, and common law provide that if two or more persons are subject to liability for damages or costs for the same injury, one person may claim contribution from the other for any damages or costs incurred by that person in excess of his or her equitable share.

325.    Honeywell and Defendants are all liable for contamination at Onondaga Lake that has resulted in and will result in the incurrence of costs by Honeywell pursuant to the 2007 Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and in the investigation of SYW-12.

326.    As a direct and proximate result of the acts and/or omissions of Defendants, Honeywell has incurred, and will incur in the future, costs pursuant to the 2007 Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and the investigation of SYW-12, in excess of its equitable share.

327.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in

connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs and costs incurred in connection with the 2018 NRD Consent Decree against Defendants.

## <u>RELIEF REQUESTED</u>

WHEREFORE, Honeywell requests judgment in its favor,

328.    Declaring Defendants, pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to be jointly and severally liable for response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to the investigation of environmental contamination at SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

329.    Ordering Defendants, pursuant to section 113(f) of CERCLA, 42 U.S.C. § 9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law § 176(8), N.Y. C.P.L.R. § 1401, and/or common law, contribute their equitable share of response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to the investigation and remediation of environmental contamination at the Onondaga Lake Bottom Subsite and SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

330.    Entering a declaratory judgment, which will be binding in any subsequent action or actions that Honeywell may bring to recover response, removal, and/or cleanup costs against Defendants, that Defendants are liable for their equitable share of response costs that Honeywell may incur in the investigation and cleanup of environmental contamination at the Onondaga Lake Bottom Subsite and SYW-12.

331.    Ordering Defendants, pursuant to section 113(f) of CERCLA, 42 U.S.C. § 9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law § 176(8), N.Y. C.P.L.R. § 1401, and/or common law, contribute their equitable share of NRD costs incurred or to be incurred by Honeywell pursuant to the 2018 NRD Consent Decree, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

332.    Entering a declaratory judgment, which will be binding in any subsequent action or actions that Honeywell may bring to recover costs incurred pursuant to the 2018 NRD Consent Decree against Defendants, that Defendants are liable for their equitable share of NRD costs that Honeywell may incur pursuant to the 2018 NRD Consent Decree.

## DEMAND FOR JURY TRIAL

Honeywell hereby demands trial by jury of any and all issues so triable.

Dated: June 1, 2018

                              ARNOLD & PORTER KAYE SCHOLER LLP


Of Counsel:                   By:    /s/ *Brian D. Israel*
                                     Brian D. Israel, NDNY Bar No.: 514704
                                     Lauren Daniel, NDNY Bar No.: 700114
                                     Arnold & Porter Kaye Scholer LLP
                                     601 Massachusetts Ave. NW
                                     Washington, DC 20002
                                     Telephone:  202.942.6546
                                     Facsimile:  202.942.5999
                                     email:  brian.israel@arnoldporter.com
                                     email:  lauren.daniel@aporterporter.com

                                     Attorneys for Honeywell International Inc.