**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Honeywell International Inc., | |
| *Plaintiff*, | |
| v. | |
| Buckeye Partners, L.P., Buckeye GP LLC, Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P., | |
| *Defendants.* | |
| Buckeye Partners, L.P., Buckeye GP LLC, Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P., | |
| *Third-Party Plaintiffs*, | **Civil Action No. 5:18-CV-0646 (FJS/ML)** |
| v. | |
| YAD Associates, Inc.; Pyramid Company of Onondaga, Robert J. Congel, and Bruce A. Keenan, | |
| *Third-Party Defendants.* | |
| Buckeye Partners, L.P., Buckeye GP LLC, Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P., | |
| *Third-Party Plaintiffs*, | |
| v. | |
| Atlantic Richfield Company, Citgo Petroleum Corporation, Chevron Corporation, Chevron U.S.A. Inc., Kinder Morgan, Inc., ExxonMobil Oil Corporation, Exxon Mobil Corporation, Hess Corporation, Shell Oil Company, Sunoco (R&M), LLC, Sun Pipe Line Company, LLC, Texaco, Inc., TRMI-H LLC, | |
| *Third-Party Defendants.* | |

## AMENDED THIRD-PARTY COMPLAINT

Third-Party Plaintiffs, Buckeye Partners, L.P., Buckeye GP LLC, Buckeye Pipe Line Company, L.P., and Buckeye Pipe Line Holdings, L.P., (collectively herein "Buckeye" or "Third-Party Plaintiffs"), by and through their attorneys, Hancock Estabrook, LLP, as and for its Third-Party Complaint against the Third-Party Defendants Atlantic Richfield Company, Citgo Petroleum Corporation, Chevron Corporation, Chevron U.S.A. Inc., Kinder Morgan, Inc., ExxonMobil Oil Corporation, Exxon Mobil Corporation, Hess Corporation, Shell Oil Company, Sunoco (R&M), LLC, Sun Pipe Line Company, LLC, Texaco, Inc., and TRMI-H LLC (collectively herein "Third-Party Defendants") state as follows:

## PRELIMINARY STATEMENT

1.     This is a third-party action brought against the Third-Party Defendants seeking their respective contribution to any potential liability found to accrue to Buckeye in the underlying cost recovery action (the "Underlying Action") brought by Honeywell International Inc. ("Honeywell") alleging that it incurred and will continue to incur costs associated with the remediation of portions of Onondaga Lake, and adjacent land areas, as a result of the alleged release of petroleum and hazardous substances between approximately the 1900s through the 1990s (the "Relevant Time Period") that allegedly originated from bulk petroleum storage terminals and pipeline systems located in an area to the southeast of Onondaga Lake, Syracuse, New York, formerly referred to as "Oil City" (hereinafter "Oil City").

2.     This third-party action also alleges and independent, additional claim against ExxonMobil seeking contractual indemnification based upon an Assets Purchase Agreement entered into between ExxonMobil and Buckeye on or about November 29, 1983 which transferred certain land at 370 Hiawatha Boulevard and 401 Hiawatha Boulevard West, Syracuse, New York

which was used to operate tank terminal facilities to Buckeye (the "Asset Purchase Agreement").

A copy of the ExxonMobil Assets purchase Agreement is attached hereto as **Exhibit "A"**.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this matter pursuant to sections 113(b) and 113(g)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") 42 U.S.C. §§ 9613(b), (g)(3), section 1017(b) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331, 1367.

4.      Venue is appropriate in the Northern District of New York pursuant to 28 U.S.C. § 1391 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the alleged releases or threatened releases of hazardous substances that gave rise to this action occurred or will occur in this district.

**UNDERLYING AND RELATED ACTIONS**

5.      Honeywell commenced the Underlying Action against Buckeye, ExxonMobil Oil Corporation and ExxonMobil Corporation ("ExxonMobil Defendants") by Summons and Complaint on June 1, 2018.  Dkt. 1.

6.      Buckeye filed its Answer on August 6, 2018.  Dkt. 11.

7.      The Exxon Defendants filed their Answer on June 28, 2018.  Dkt. 9.

8.      Honeywell voluntarily dismissed its claims against the ExxonMobil Defendants by stipulation submitted August 30, 2018.  Dkt. 18.

9.      On September 28, 2018, Honeywell commenced a separate action against Sunoco (R&M), LLC, Sunoco, Inc., Sun Pipe Line Company, LLC, and Atlantic Refining & Marketing, LLC alleging identical causes of action based on the same set of circumstances as set forth in the

Underling Action (the "Sunoco Action").  *See Honeywell v. Sunoco (R&M), LLC, et al.*, No. 5:18-cv-1176; Dkt. 1.

10.     On January 9, 2019, Buckeye moved to consolidate the Sunoco Action with underlying action.  Dkt. 25.

11.     On October 2, 2019, Honeywell commenced a separate action against Citgo Petroleum Corporation, alleging identical causes of action based upon the same set of circumstances as set forth in the underlying action (the "Citgo Action").  *See Honeywell v. Citgo* No. 5:19-cv-1219; Dkt. 1.

12.     On October 30, 2019 Buckeye moved to consolidate the Citgo Action with the underlying action. Dkt. 107 through 107-3.

## PARTIES TO THE THIRD-PARTY ACTION

13.     Third-Party Plaintiff Buckeye Partners, L.P., is a Delaware limited partnership with its principal executive offices at One Greenway Plaza Suite, 600, Houston, Texas 77046.

14.     Third-Party Plaintiff Buckeye GP, LLC, is a Delaware limited liability company with its principal executive offices at 5 Tek Park, 9999 Hamilton Boulevard, Breinigsville, Pennsylvania 18031.

15.     Third-Party Plaintiff Buckeye Pipe Line Company, L.P., is a Delaware limited partnership with its principal executive offices at 5 Tek Park, 9999 Hamilton Boulevard, Breinigsville, Pennsylvania 18031.

16.     Buckeye Pipe Line Company, L.P., and Buckeye Pipeline Holdings, L.P., are subsidiaries of Buckeye Partners, L.P.

17.     Buckeye GP, LLC is the sole general partner of Buckeye Partners, L.P.

<u>Hess</u>

18.     Upon information and belief, Hess Corporation ("Hess") is a Delaware corporation with its principal executive offices at 1185 Avenue of the Americas, 40th Floor, New York, New York 10036.

19.     Upon information and belief, Hess is the current successor in interest to the Amerada Hess Corporation, the Amerada Petroleum Corporation, and/or the Hess Oil & Chemical Corporation, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "1" (hereinafter "Terminal 1").

20.     Upon information and belief, Hess is the current successor in interest to Delhi-Taylor Oil Corporation and/or Hess Oil & Chemical Corporation, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "7" (hereinafter "Terminal 7").

<u>ExxonMobil</u>

21.     Upon information and belief, ExxonMobil Oil Corporation is a New York corporation with its principal executive offices at 5959 Las Colinas Boulevard, Irving, Texas 75039.

22.     Upon information, the Exxon Mobil Corporation is a New Jersey corporation with its principal executive offices at 5959 Las Colinas Boulevard, Irving, Texas 75039.

23.     Upon information and belief, Defendant ExxonMobil Oil Corporation operates as a subsidiary of Exxon Mobil Corporation; both will hereafter be referred to as ("ExxonMobil").

24.     Upon information and belief, ExxonMobil is the current successor in interest to Esso Standard Oil Company, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "2" (hereinafter "Terminal 2"), (ii) received barge deliveries of

petroleum products *via* the Barge Canal; and (iii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

25.     Upon information and belief, ExxonMobil is the current successor in interest to Standard Oil Company of New York or SOCONY and or the Mobil Oil Company ("Mobil"), which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "6" (hereinafter "Terminal 6"); and (ii) owned and operated an interstate pipeline that delivered petroleum products to its Oil City terminal.

### Sunoco

26.     Upon information and belief, Sunoco (R&M), LLC ("Sunoco") is a Pennsylvania limited liability company with its principal executive offices at 1735 Market Street, Philadelphia, Pennsylvania 19103.

27.     Upon information and belief, Sunoco is the current successor in interest to The Sun Oil Company and/or the Sun Oil Company of Pennsylvania, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "3" (hereinafter "Terminal 3"); and (ii) received barge deliveries of petroleum products *via* the Barge Canal.

### Sun Pipe Line

28.     Upon information and belief, Sun Pipe Line Company, LLC ("Sun Pipe Line") is a Texas corporation with its principal executive offices at 3801 Chester Pike, Newtown Square, Pennsylvania 19073.

29.     Upon information and belief, Sun Pipe Line Company, LLC is the current successor in interest to Sun Pipe Line Company and Susquehanna Pipe Line Company which owned and operated an interstate pipeline that delivered petroleum products to Sunoco's Oil City terminal (Terminal 3).

<u>Shell</u>

30.     Upon information and belief, Shell Oil Company ("Shell"), is a corporation established under the laws of the State of Delaware, with its principal executive offices at 1 Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.

Upon information and belief, Shell is the current successor in interest to Shell Union Oil Company and Shell Eastern Petroleum Products Inc., which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "5" (hereinafter "Terminal 5"); (ii) received barge deliveries of petroleum products *via* the Barge Canal; and (iii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

<u>Chevron</u>

31.     Upon information and belief, Chevron Corporation is a Delaware corporation with its principal executive offices at 6001 Bollinger Canyon Road, San Ramon, California 94583.

32.     Upon information and belief, Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal executive offices at 6001 Bollinger Canyon Road, San Ramon, California 94583.

33.     Upon information and belief, Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron Corporation; both will hereafter be referred to as ("Chevron").

34.     Upon information and belief, Texaco, Inc., (Texaco), who is a Delaware corporation with its principal executive offices at 6001 Bollinger Canyon Road, San Ramon, California 94583, is a wholly owned subsidiary of Chevron Corporation.

35.     Upon information and belief, Chevron is the current successor in interest to The Texas Company and/or Texaco, Inc. ("Texaco"), which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "8" (hereinafter "Terminal 8"), (ii) received barge

deliveries of petroleum products *via* the Barge Canal; (iii) maintained two petroleum shipper lines to transport petroleum from a pipeline manifold to its storage tanks.

36.     Upon information and belief, Chevron is the current successor in interest to the Gulf Oil Corporation ("Gulf"), which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "9" (hereinafter "Terminal 9"), (ii) received barge deliveries of petroleum products via the Barge Canal; (iii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

<u>TRMI-H LLC</u>

37.     Upon information and belief, TRMI-H LLC is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, California 94583.

38.     Upon information and belief, TRMI-H LLC is the current successor in interest to TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, Getty Oil Company (Eastern Operations), Inc., Tidewater Associated Oil Company, and Tidewater Oil Company, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "10" (hereinafter "Terminal 10"), (ii) received barge deliveries of petroleum products *via* the Barge Canal; (iii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

<u>Citgo</u>

39.     Upon information and belief, Citgo Petroleum Corporation ("Citgo") is a Delaware corporation with its principal executive offices at 1293 Eldridge Parkway, Houston, Texas 77077.

40.     Upon information and belief, Citgo is the current successor in interest to the Cities Service Oil Company and the Cities Service Company, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "11" (hereinafter "Terminal 11"), (ii)

received barge deliveries of petroleum products *via* the Barge Canal; (iii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

<u>ARCO</u>

41.     Upon information and belief, the Atlantic Richfield Company ("ARCO") is a Delaware corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, Texas 77079.

42.     Upon information and belief, ARCO is the current successor in interest to the Atlantic Petroleum Storage Company and/or Atlantic Refining Company ("Atlantic"), which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "4" (hereinafter "Terminal 4"); and (ii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

43.     Upon information and belief, ARCO is the current successor in interest to the Richfield Oil Company of New York, which (i) owned and operated a bulk petroleum storage facility at Oil City at terminal parcel "12" (hereinafter "Terminal 12"), (ii) received barge deliveries of petroleum products *via* the Barge Canal; (iii) maintained two petroleum shipper lines to transport petroleum from a pipeline manifold to its storage tanks.

<u>Kinder Morgan</u>

44.     Upon information and belief, Kinder Morgan, Inc. ("Kinder Morgan") is a Delaware corporation with its principal executive offices at 1001 Louisiana Street, Suite 1000, Houston, Texas 77002.

45.     Upon information and belief, in or about 2014, Kinder Morgan became the successor by merger to El Paso Holdco, LLC.

46.     Upon information and belief, in or about 2012, El Paso Holdco, LLC became the successor by merger to El Paso Corporation,

47.      Upon information and belief, in or about 2001, El Paso Corporation became the successor by merger to Coastal Corporation f/k/a Coastal States Gas Producing Company.

48.     Upon information and belief, Coscol Petroleum Corporation ("Coscol"), which was formerly a wholly-owned subsidiary of Coastal Corporation, is a now a predecessor in interest to Kinder Morgan").

49.     Upon information and belief, Kinder Morgan, or its aforementioned predecessors in interest (i) owned and operated a bulk petroleum storage facility at Oil City at Terminal 7 and/or 8; and (ii) maintained a petroleum shipper line to transport petroleum from a pipeline manifold to its storage tanks.

## HONEYWELL'S ALLEGATIONS IN THE UNDERLYING ACTION

50.     In the Underlying Action, (Dkt. 1), whose contents and allegations are incorporated by reference, Honeywell has sued Buckeye pursuant to the CERCLA, 42 U.S.C. §§ 9601 *et seq*., OPA, 33 U.S.C. §§ 2701 *et seq*., and New York State law, as set forth below, for costs incurred and to be incurred as a result of releases of petroleum and hazardous substances into Onondaga Lake, its tributaries, and onto land areas which drain into Onondaga Lake in Onondaga County, New York.

51.     In the Underlying Action, Honeywell specifically seeks recovery of costs associated with the remediation of contamination of sediment and surface water in a certain portion of Onondaga Lake referred to as SMU-6, the contamination of sediment, soil, and groundwater at state wetland SYW-12, as well the contamination or harm to fish and other aquatic life, that pose, or may pose a threat of harm to the public health and safety.

52.     In the Underlying Action, Honeywell alleges that petroleum storage and transportation operations conducted at, and in the vicinity of, the bulk petroleum storage facilities existing at Oil City during the Relevant Time Period created leaks and/or spills of various petroleum contaminants, including polycyclic aromatic hydrocarbons ("PAHs"), which migrated along various pathways to SMU-6 and SYW-12 and thereby contributed to Honeywell's need to remediate those areas.

53.     Honeywell's allegations against Buckeye in the Underlying Action relate, in part, to Buckeye's operation of a petroleum delivery pipeline and a bulk petroleum storage facility, with associated storage tanks, for a period of approximately seven years, on one of the petroleum storage terminals parcels located in Oil City.

54.     In the Underlying Action, Honeywell alleges that during Buckeye's operation of its pipeline and its bulk petroleum storage facility in Oil City, petroleum contaminants were leaked and/or spilled, which contaminated the immediate vicinity of the storage tanks and pipeline and ultimately migrated *via* various pathways to SMU-6 and SYW-12.

55.     Based on the nature of Honeywell's allegations in the Underlying Action, if those allegations are determined by the finder of fact to be true and/or valid, any owner/operator of a bulk petroleum storage facility or petroleum pipeline at or in the vicinity of Oil City at which leaks or spills occurred would be liable to Honeywell under the same theories of liability asserted against Buckeye.

## **OIL CITY**

56.     Oil City sits southeast of Onondaga Lake and was historically comprised of a collection of at least twelve (12) separate storage terminals formerly operated and/or owned by certain Third-Party Defendants.

57.     Oil City was used as both a bulk petroleum storage facility and a distribution hub from approximately the 1900s through the 1990s.

58.     Upon information and belief, Third-Party Defendants used Oil City as a location to store petroleum products on their respective terminal properties including:

        a.      Gasoline (leaded and unleaded);

        b.      Kerosene;

        c.      Furnace Oil;

        d.      No. 2 fuel oil;

        e.      No. 4 fuel oil;

        f.      No. 6 fuel oil;

        g.      Aviation fuel;

        h.      Diesel fuel;

        i.      Petroleum additives; and

        j.      Other hazardous products.

59.     Upon information and belief, the Third-Party Defendants' individual and collective operations at Oil City generated and required disposal of hazardous wastes including PCB wastes, PCP wastes, barium, mercury, lead, methanol, slop, sludge, and other hazardous wastes.

60.     The twelve (12) terminals at Oil City were supplied in two primary fashions: (1) pipelines and (2) barge deliveries.

61.     The pipelines supplying all twelve (12) terminals were owned and operated by Buckeye, Mobil, and Sun Pipe Line.

62.     Onondaga Creek, which flows through Oil City to Onondaga Lake, was reconstructed to form the Barge Canal in 1918 to accommodate barge deliveries of petroleum

products to the Oil City Terminals.  These barge deliveries to the Third-Party Defendants' holdings continued until approximately the late 1980s.

63.     Upon information and belief, each of the Third-Party Defendants, or their predecessors, utilized barge deliveries *via* the Barge Canal during their operation of the Oil City Terminals.

64.     If Honeywell's theory of liability set forth in the Underlying Action is found to be valid, while under the ownership and/or operation of the Third-Party Defendants, their respective bulk petroleum storage facilities were the sources of leaks and spills of petroleum and other potentially hazardous substances.

65.     Specific reported incidences of spills and leaks at the individual terminals, as well as the party owning and/or operating the terminal at the time are detailed below.  However, if Honeywell's theory of liability set forth in the Underlying Action is found to be valid, upon information and belief, a number of spills and leaks went largely been undocumented.

66.     A breakdown of the individual terminals is provided below:



*Terminal 1 (Hess)*

67.     Terminal 1 is located on the northern side of Hiawatha Boulevard and is bordered to the southeast by the Barge Canal.

68.     Upon information and belief, in 1959, a pipe carrying dredge sludge from the Barge Canal to Onondaga Lake, located in the vicinity Terminal 1, could be observed shooting streams of sludge onto the ground.

69.     Upon information and belief, around 1966, Defendant Hess began operations at Terminal 1.  At the time, Terminal 1 consisted of two large gasoline storage tanks as well as a filling station.

70.     Upon information and belief, the southwestern part of Terminal 1 featured a dock/pipeline set up for off-loading and on-loading petroleum products onto barges docked on the Barge Canal.

71.     In 1973, the United States Environmental Protection Agency issued a permit which allowed Hess to discharge effluent from Terminal 1 directly into the Barge Canal.  The permit noted that Hess was actively storing gasoline and residual fuels at Terminal 1.

72.     A newspaper article in 1974 noted that the total storage capacity at Terminal 1 was 5,643,600 gallons.

73.     Photographs from the 1980s show that, in addition to the two large storage tanks, six more medium-sized tanks now populated Terminal 1.

74.     In 1986, it was reported that the average daily through-put to Terminal 1 was 108,107 gallons of gasoline, 15,918 gallons of No. 2 fuel oil, and 2,520 gallons of kerosene.

75.     Upon information and belief, by 1987, Terminal 1 contained the following tanks and storage capacities:

       a.      Five (5) tanks dedicated to gasoline (4,280,766 gals.)

       b.      One (1) tank dedicated to #2 fuel oil (3,199,812 gals.)

       c.      One (1) tank dedicated to kerosene (1,196,706 gals.)

76.     Upon information and belief, starting around 1989, the structures at Terminal 1 began to be torn down.

77.     Upon information and belief, in 1991, Carousel Mall officials requested that they be allowed to leave 60,000 cubic yards of "hazardous" soil on the Hess site buried under all parking lot.  It was noted that the soil contained trichloroethylene, toluene, and acetone.

78.     Upon information and belief, in 1994, the last of the Hess tanks were torn down.

79.     Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under Gulf and Hess at Terminal 1.

80.     Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Hess's operations at Terminal 1 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

### Terminal 2 (ExxonMobil)

81.     Terminal 2 is comprised of two lots: one on the western side of Hiawatha Boulevard and one on the eastern side of Hiawatha Boulevard and to the south of Solar Street.

### Terminal 2 – Western Side of Hiawatha Boulevard

82.     Upon information and belief, from around 1910 to 1930, this portion of Terminal 2 was the site used for dumping wastes from the Solvay chemical plants.

83.     Upon information and belief, ExxonMobil operated the petroleum storage and distribution facilities at this portion of Terminal 2 beginning in approximately 1950.

84.     Upon information and belief, from 1950 until 1990, a single 2,500,000 gallon tank was used to store and distribute No. 2 fuel oil at this location.

85.     Upon information and belief, around 1990, this portion of Terminal 2 was purchased by developers for construction of a shopping mall.

### Terminal 2 – Eastern Side of Hiawatha Boulevard

86.     Upon information and belief, starting in the 1920s, Beacon Oil Company began petroleum operations at this portion of Terminal 2.

87.     Upon information and belief, by the 1940s, the plot had four petroleum storage tanks and featured a dock/pipeline set up for off-loading and on-loading petroleum products onto barges docked on the Barge Canal.

88.     Upon information and belief, barge deliveries to this portion of Terminal 2 were a regular method of moving petroleum products in and out of the facility.

89.     Upon information and belief, in 1947, ExxonMobil took over operations at this portion of Terminal 2.

90.     Upon information and belief, by 1950, the site had expanded to include ten (10) storage tanks, ranging in size from 15,000 gallons to 1,692,000 gallons.

91.     Two (2) more storage tanks, holding 1,050,000 gallons and 630,000 gallons, were added by 1965.

92.     In 1983, Buckeye took over operations for the entirety of Terminal 2 pursuant to the Asset Purchase Agreement.

93.     In that Asset Purchase Agreement, ExxonMobil pledged in paragraph 18 that it would remain responsible for all costs and/or damages arising out of spills, leaks, or other discharge of petroleum products or solvents during the period of time for which ExxonMobil was the operator of the property.  *See*, Ex. A, pp. 18-19.

94.     Furthermore, in that Asset Purchase Agreement, the parties agreed, in paragraph 20, that ExxonMobil would indemnify and defend Buckeye against all claims, demands and expenses (including reasonable attorneys' fees), causes of action and suits arising out of ExxonMobil's ownership or operation of the project property prior to the Closing.  *See*, Ex. A, p. 20.

95.     Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from ExxonMobil's operations at Terminal 2 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

**Terminal 3 (Sunoco)**

96.     Terminal 3 is comprised of two lots straddling either side of Solar Street.

97.     Upon information and belief, throughout its history as a petroleum storage facility, both portions of Terminal 3 have been owned and/or operated by Sunoco and its predecessors in interest.

98.     Upon information and belief, the portion on the northern side of Solar Street was the hub of the petroleum operations.

99.     Upon information and belief, the portion on the southern side of Solar Street was kept vacant and used as a corridor for Sunoco's pipeline that ran from the dock/pipeline on the Barge Canal to Terminal 3's storage facilities on the northern side of Solar Street.

100.    Upon information and belief, operations at Terminal 3 began in the 1940s with a single filling station and quickly expanded to include eight (8) storage tanks holding kerosene, No. 2 fuel oil, and gasoline.  The total storage capacity in 1950 was approximately 2,500,000 gallons.

101.    Upon information and belief, by 1965, Sunoco's operations at Terminal 3 had added three more storage tanks for petroleum products, bringing the total count to ten (10) tanks with a storage capacity of nearly 3,000,000 gallons.

102.    Upon information and belief, in the 1980s Terminal 3 was operating seven (7) tanks with 3,360,000 gallons capacity for gasoline and 1,680,000 gallons capacity for No. 2 fuel oil, and

an average daily through-put of approximately 157,000 gallons of gasoline and 18,500 gallons of No. 2 fuel oil.

103.     Upon information and belief, around the same time, reporting spills became a more common practice.  Thus, in the 1980s, there were at least three (3) documented spills at Terminal 3.

104.     Upon information and belief, operations at Terminal 3 ceased sometime during the early 1990s with the last of the Sunoco tanks being torn down in 1999.

105.     Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under Sunoco at Terminal 3.

106.     Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Sunoco's operations at Terminal 3 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

**Terminal 4 (Atlantic/ARCO)**

107.     Terminal 4 is comprised of two lots straddling either side of Solar Street.

108.     Upon information and belief, the portion on the northern side of Solar Street was the hub of the petroleum operations.

109.     Upon information and belief, the portion on the southern side of Solar Street was kept vacant and used as a corridor for a pipe that ran from the dock/pipeline on the Barge Canal to Terminal 4's storage facilities on the northern side of Solar Street.

110.     Upon information and belief, Atlantic begin petroleum operations at Terminal 4 prior to 1940 with four (4) storage tanks located on the northern side of Solar Street.

111.    Upon information and belief, by 1950, Atlantic's storage capacity had increased to four (4) gasoline tanks, two (2) No. 2 fuel oil tanks, and a kerosene tank.

112.    Upon information and belief, a third No. 2 fuel oil tank with the capacity to store 2,310,000 gallons was added in 1953.

113.    Upon information and belief, by 1960, Terminal 4 sported the following tank breakdown with associated capacities:

       a.    One (1) premium tank – 470,400 gallons

       b.    Two (2) house brand tanks – 1,654,800 gallons

       c.    Two (2) kerosene tank – 1,075,200 gallons

       d.    Three (3) No. 2 fuel oil tanks – 3,834,600 gallons

114.    Upon information and belief, around 1956, Atlantic became ARCO when it merged with the Richfield Oil Corporation.

115.    In 1979, a spill of 97,000 gallons was reported at Terminal 4.  The very next year, a spill of 84,000 gallons was reported.  A third spill was reported in 1981.

116.    Upon information and belief, as petroleum operations continued in 1987, ARCO had storage capacity for approximately 4,700,000 gallons of gasoline, 2,200,000 gallons of No. 2 fuel oil, and 227,000 gallons of kerosene.

117.    Upon information and belief, petroleum operations ceased at Terminal 4 sometime in the early 1990s.

118.    Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under ARCO/Atlantic at Terminal 4.

119.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from ARCO/Atlantic's operations at Terminal 4 would have filtered

into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

### *Terminal 5 (Shell and Citgo)*

120.    Terminal 5 is comprised of two lots straddling either side of Solar Street.

121.    Upon information and belief, the portion on the northern side of Solar Street was the hub of the petroleum operations.

122.    Upon information and belief, the portion on the southern Side of Solar Street was kept vacant until approximately 1953 and used as a corridor for a pipe that ran from the dock/pipeline on the Barge Canal to Terminal 5's storage facilities on the northern side of Solar Street.

123.    Upon information and belief, Shell began operations some time prior to 1940 with six (6) large petroleum storage tanks.

124.    Upon information and belief, in 1950, Shell had expanded its operations to include the following tanks with associated storage capacities:

      a.    Two (2) gasoline tanks – 1,260,000 gallons

      b.    Three (3) fuel oil tanks – 945,000 gallons

      c.    Two (2) kerosene tanks – 315,000 gallons

      d.    ethyl and spirits tanks – 42,000 gallons

125.    Upon information and belief, two (2) large storage tanks were added to the Terminal 5 portion on the southern side of Solar Street in 1953.

126.    Upon information and belief, the reported approximate storage capacity in 1960 breaks down as follows:

      a.    One (1) aviation fuel tank – 1,350,000 gallons

   b.  Two (2) premium tank – 1,600,000 gallons

   c.  Two (2) house brand tanks – 2,500,000 gallons

   d.  Three (3) kerosene tanks – 1,400,000 gallons

   e.  Three (3) No. 2 fuel oil tanks – 2,500,000 gallons

   f.  Three (3) contamination tanks – 37,800 gallons

127. Upon information and belief, in 1974, Shell had a total storage capacity of approximately 6,450,000 gallons at Terminal 5.

128. Upon information and belief, in 1983, the Alaskan Oil Company took over operation of the northern side of Solar Street and Citgo took over operation of the southern side of Solar Street.

129. Upon information and belief, the combined operations at the Terminal in 1987 included storage for:

   a.  3,360,000 gallons of gasoline;

   b.  1,680,000 gallons of No. 2 fuel oil;

   c.  1,470,000 gallons of kerosene;

   d.  63,000 gallons for "slop;" and

   e.  21,000 gallons for additives.

130. Upon information and belief, operations continued at Terminal 5 until the mid-1990s.

131. Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under Shell and Citgo at Terminal 5.

132. Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Shell and Citgo's operations at Terminal 5 would have filtered

into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

### *Terminal 6 (ExxonMobil)*

133.    Terminal 6 is comprised of three parcels: the northern side of Solar Street, the southern side of Solar Street and west of Bear Street, and the southern side of Solar Street and east of Bear Street.

134.    Upon information and belief, petroleum operations at Terminal 6 began as far back as 1886; however, Mobil, and its predecessors in interest, did not begin their operations until 1889 when it acquired the Acme Oil Company.

135.    Upon information and belief, in 1896, Terminal 6 housed seventeen (17) storage tanks with a total capacity of approximately 800,000 gallons.  The tanks stored standard oils, vacuum oils, paraffin oils, black oils, car and axel greases, paraffin waxes, electric cycle oils, cycle lantern oils, and petrolatum.

136.    Upon information and belief, modern petroleum operations began at Terminal 6 around 1907.

137.    Upon information and belief, in the years prior to 1919, Mobil began expanding its storage tanks in preparation for the opening of the Barge Canal.

138.    Upon information and belief, after the Barge Canal opened, Mobil began receiving regular barge deliveries of petroleum products which were stored at Terminal 6.

139.    Upon information and belief, in 1925, a spark came into contact with a trench at the Terminal, igniting the gasoline that had been accumulating within.

140.    Upon information and belief, in 1941, Mobil had twenty-two (22) storage tanks at Terminal 6.

141.    In 1942, the Mobil pipeline alone transported 10,200,000 gallons of No. 2 fuel oil to Oil City.

142.    Upon information and belief, a stream of gasoline was discovered in 1945, originating from Mobil's storage tank and flowing over the ground into the Barge Canal.

143.    In 1950, Sanborne Maps reflect nineteen (19) total storage tanks of varying size at the Terminal.

144.    Upon information and belief, although Terminal 6 began partially being supplied by the Mobil pipeline in 1961, barge deliveries of petroleum products *via* the Barge Canal continued until the late 1970s.

145.    Upon information and belief, by 1974, Mobil had increased its total storage capacity to approximately 15,000,000 gallons.

146.    Upon information and belief, Mobil maintained its 15-million-gallon capacity in 1986 while averaging a daily through-put of approximately:

        a.      gasoline – 265,000 gallons

        b.      No. 2 fuel oil – 12,600 gallons

        c.      aviation fuel – 25,200 gallons

        d.      diesel fuel – 21,000 gallons

147.    Upon information and belief, in 1987, Mobil's capacity remained at its previous levels and included six (6) Gasoline tanks (9,500,000 gallons), four (4) aviation fuel tanks (2,500,000 gallons), and three (3) No. 2 fuel oil tanks (4,100,000 gallons).

148.    Upon information and belief, although no diesel tanks remained in service during 1987, records show that Mobil was blending the diesel fuel at the truck loading facility located at Terminal 6.

149.     Upon information and belief, an additional spill was recorded in the New York State Department of Environmental Conservation's ("NYSDEC's") spill database, and, upon further investigation, widespread contamination was observed at Terminal 6.

150.     Upon information and belief, by 1990, petroleum operations at Terminal 6 had begun to wind down with only the two portions of Terminal 6 that sat on the southern side of Solar Street still actively storing petroleum products.

151.     Upon information and belief, a spill of approximately 3,000 gallons of gasoline occurred due to a pipeline malfunction in 1995.

152.     Upon information and belief, in 1998, Mobil tore down the last of its petroleum storage tanks at Terminal 6.

153.     Upon information and belief, the next year, Mobil merged with Exxon to form Defendant ExxonMobil.

154.     Upon information and belief, ExxonMobil assumed responsibility for Terminal 6 and the pipeline that supplied the Terminal.

155.     Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under Mobil at Terminal 6.

156.     Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Mobil's operations at Terminal 6 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

### Terminal 7 (Hess)

157.     Terminal 7 is located at the eastern side of the intersection of Solar and Bear Streets.

158.    Upon information and belief, the Delhi-Taylor Corporation began petroleum operations at Terminal 7 in 1961 with the construction of four (4) storage tanks:

        a.    Two (2) gasoline tanks – 3,800,000 gallons

        b.    One (1) No. 2 fuel Oil – 3,600,000 gallons

        c.    One (1) kerosene – 1,500,000 gallons

159.    Upon information and belief, records indicate that Hess took over petroleum operations at Terminal 7 in 1965 and continued through the 1990s.

160.    Upon information and belief, unreported leaks and spills resulted from the continued petroleum operations under Hess at Terminal 7.

161.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Hess's operations at Terminal 7 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

***Terminal 8 (Texaco and Chevron):***

162.    Terminal 8 is comprised of two lots straddling either side of Solar Street.

163.    Upon information and belief, both portions were actively used to store and distribute petroleum products.

164.    Upon information and belief, the portion on the southern Side of Solar Street was also used as a corridor for a pipe that ran from the dock/pipeline on the Barge Canal to Terminal 8's storage facilities.

165.    Upon information and belief, petroleum operations began at Terminal 8 prior to 1941 and continued with Texaco expanding the facility to include four (4) storage tanks.

166.     Upon information and belief, by 1960, Texaco was operating five (5) storage tanks for gasoline and No. 2 fuel oils with a combined capacity of approximately 4,500,000 gallons.

167.     Upon information and belief, during the early 1970s, Texaco was discharging effluent directly into the Barge Canal under a permit issued by the United States Environmental Protection Agency ("USEPA").

168.     Upon information and belief, storage capacity for petroleum products had increased to approximately 5,500,000 gallons by 1974.

169.     Upon information and belief, in 1978, 6,000 gallons of No. 2 fuel oil was spilled into a roadside ditch at Terminal 8.

170.     Upon information and belief, another spill was reported on the DEC database in 1988.

171.     Upon information and belief, in 1990, yet another spill at Terminal 8 was reported on the NYSDEC's database.

172.     Upon information and belief, petroleum operations ceased at Terminal 8 during the mid to late 1990s.

173.     Upon information and belief, unreported leaks and spills resulted from the continued petroleum operations under Texaco at Terminal 8.

174.     Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Texaco operations at Terminal 8 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

### Terminal 9 (Gulf and Chevron):

175.    Terminal 9 is located on the northern side of Solar Street.

176.    Upon information and belief, Gulf began petroleum operations at Terminal 9 some time prior to 1940 and had in place fourteen (14) petroleum storage tanks by 1950.

177.    Upon information and belief, operations expanded by 1960 to include the following tanks and associated capacities:

> a.    Two (2) gasoline tanks – 2,400,000 gallons
>
> b.    One (1) house brand tank – 1,800,000 gallons
>
> c.    One (1) kerosene tank – 508,000 gallons
>
> d.    One (1) No. 2 fuel oil tank – 1,800,000 gallons

178.    Upon information and belief, continuing to grow their footprint, Gulf added several additional tanks around 1965, bringing the total to seventeen (17).

179.    Upon information and belief, in 1980, Terminal 9 was storing approximately 4,000,000 gallons of gasoline; 1,300,000 gallons of No. 2 fuel oil; 520,000 gallons of kerosene; and 20,000 gallons of "slop."

180.    Upon information and belief, Chevron succeed Gulf as the operator of Terminal 9 in the late 1980s/early 1990s.

181.    Upon information and belief, unreported leaks and spills resulted from the continued petroleum operations under Gulf and Chevron at Terminal 9.

182.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Gulf and Chevron's operations at Terminal 9 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

*Terminal 10 (TRMI-H):*

183.    Terminal 10 is located on the northern side of Solar Street.

184.    Upon information and belief, Tidewater began petroleum operations at some point prior to 1940 with three (3) gasoline storage tanks, one (1) No. 2 fuel oil storage tank, and one (1) ethyl gasoline storage tank.

185.     Upon information and belief, in 1960, Tidewater's total storage capacity for all petroleum products was approximately 2,500,000 gallons.

186.    Upon information and belief, the operations at Terminal 10 were converted to exclusively storing No. 2 fuel oil sometime during the 1980s.

187.    Upon information and belief, at some point after 1965, Getty Oil succeeded Tidewater as the owner/operator of Terminal 10.

188.    Upon information and belief, unreported leaks and spills resulted from the continued petroleum operations under Tidewater and Getty at Terminal 10.

189.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Tidewater and Getty's operations at Terminal 10 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

*Terminal 11 (Citgo):*

190.    Terminal 11 is located on the southern side of Solar Street in between Terminals 3 and 4.

191.    Upon information and belief, Citgo owned and operated Terminal 11 from its inception around 1939 through the removal of the storage tanks in 1998.

192.    Upon information and belief, throughout its history, Terminal 11 was populated by nine (9) approximately 700,000-gallon tanks (7,700,000 gallons total) and five (5) 8,000-gallon tanks.

193.    Upon information and belief, the tanks were used to store products including gasoline, No. 2 fuel Oil, kerosene, and petroleum byproducts.

194.    Upon information and belief, in 1967, one of the gasoline storage tanks sprung a leak, spraying between 13,000 and 15,000 gallons of gasoline on to the ground creating a pond of gasoline on the ground around the tank.

195.    Upon information and belief, in 1971, the same tank ruptured once more, this time spilling 10,000 gallons of gasoline onto the ground.

196.    Upon information and belief, in 1973, Citgo was permitted by the USEPA to discharge its effluent directly into the Barge Canal.

197.    Upon information and belief, by 1987, Terminal 11 housed eight (8) Gasoline storage tanks (4,500,000 gallons) and one (1) No. 2 fuel oil storage tank (2,900,000 gallons) as well as a 20,000 gallon "slop" tank.

198.    Upon information and belief petroleum operations ceased some time during the 1990s with the last of the storage tanks being torn down during 1998.

199.    Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under Citgo at Terminal 11.

200.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from Citgo's operations at Terminal 11 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

*Terminal 12 (ARCO):*

201.     Terminal 12 is located on the opposite side of the Barge Canal from the rest of the Terminals and is abutted by Bear Street on its southwestern side.  Terminal 12 is comprised of two lots on the northern and southern sides of Van Rensselaer Street.  The northern portion of the Terminal directly abuts the Barge Canal.

202.     Upon information and belief, during the 1930s, Richfield Oil Company of New York ("Richfield") developed its footprint at Terminal 12 to include six (6) gasoline tanks (3,600,000 gallons); four (4) No. 2 fuel oil tanks (5,687,050 gallons); two (2) kerosene tanks (1,050,000 gallons); and two (2) additive tanks (22,500 gallons).

203.     Upon information and belief, among the fourteen (14) tanks was the largest storage tank in all of Oil City's history: the 4,200,000-gallon No. 2 fuel oil tank located directly adjacent to the Barge Canal.

204.     Upon information and belief, Terminal 12's large No. 2 fuel oil tank was known for leaks.

205.     Upon information and belief, photographs taken in 1956 show a crane lifting a large, leaking pipeline belonging to Richfield out of the Barge Canal.

206.     Upon information and belief, the northern portion of Terminal 12 was routinely used as a dumping ground for dredge spoils from the Barge Canal with records showing that in both 1963 and 1966 spoils were deposited at that site.

207.     Upon information and belief, in 1966, Richfield merged with the Atlantic Refining Company to form ARCO.

208.     Upon information and belief, petroleum operations continued at Terminal 12 until 1974 when Inland Chemical Corporation ("Inland") purchased the terminal from ARCO.

209.    Upon information and belief, Inland converted the Terminal into a duel-purpose facility which both stored spent and recycled chemical solvents and process intermediary chemical solvents.

210.    Upon information and belief, in 1977 records show that Methanol waste from Inland Chemical was discharged directly into the Barge Canal.

211.    Upon information and belief, McKesson Envirosystems Company purchased Terminal 12 from Inland in 1981.

212.    Upon information and belief, by the early 1990s, operations at Terminal 12 had wound down and only the large No. 2 fuel oil tank remained on the northern portion of the Terminal.

213.    Upon information and belief, although petroleum operations ceased sometime during the early 1990s, dredging spoils from the Barge Canal were still be deposited on the northern portion of Terminal 12 as late as 1998.

214.    Upon information and belief, additional, unreported leaks and spills resulted from the continued petroleum operations under the above-mentioned entities at Terminal 12.

215.    Under Honeywell's theory of liability set forth in the Underlying Action, if found to be valid, the spills and leaks from above-mentioned entities' operations at Terminal 12 would have filtered into the Barge Canal and contributed to the contamination of Onondaga Lake alleged by Honeywell to have occurred at SMU-6 and SWY-12.

## COUNT I

### Contribution Claim Pursuant to Section 113 of CERCLA

216.    Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "215" as if they had been set forth herein.

217.    Plaintiff Honeywell has sued Buckeye, *inter alia*, under sections 107 and 113 of CERCLA and seeks judgment for response costs that they incurred or that they will incur in connection with the Onondaga Lake Bottom Subsite and SYW-12.

218.    CERCLA Section 113(f), 42 U.S.C. § 9613(f), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [Section 107(a)], during or following any civil action under [Section 106] or under [Section 107(a)]."

219.    CERCLA Section 113(f), 42 U.S.C. § 9613(f), further provides that "[i]n resolving contribution claims, the Court may allocate response costs among liable parties using such equitable factors as the Court determines are appropriate."

220.    If the allegations in the Underlying Complaint are found to be valid, each of Third-Party Defendants is a "person" as defined by CERCLA § 101(21), 42 U.S.C. § 9601(21).

221.    If the allegations in the Underlying Complaint are found to be valid, each of the Third-Party Defendants' Oil City properties, terminals, and pipelines, sewers, pipes are all "facilities" within the meaning of sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9607(a).

222.    If the allegations in the Underlying Complaint are found to be valid, then there was a release of hazardous substances at and from the facilities that resulted from the activities of Third Party Defendants causing costs consistent with the National Contingency Plan ("NCP") to be incurred in response, and each of the Third-Party Defendants would therefore be liable or potentially liable parties within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a) as an owner or operator of a facility at the time of disposal and/or as a party that arranged for disposal of hazardous substances.

223.     The Underlying Action alleges that Buckeye is liable under CERCLA for response costs allegedly incurred by Honeywell and Buckeye has denied all liability under such claims; however, if Buckeye is found to be liable under CERCLA, then Buckeye is entitled to contribution from Third-Party Defendants for the response costs pursuant CERCLA Section 113(f), 42 U.S.C. § 9613(f).

224.     If and to the extent that Honeywell can establish liability against Buckeye, this Court should allocate any response costs among all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate under CERCLA Section 113(f), 42 U.S.C. § 9613(f).

## COUNT II

### Contribution Claim Pursuant to Section 113 of CERCLA for NRD Costs

225.     Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "224" as if they had been set forth herein.

226.     Plaintiffs seek judgment for response costs that they incurred or that they will incur in connection with the 2018 NRD Consent Decree.

227.     To the extent that Buckeye is adjudged liable to Honeywell in the Underlying Action, the amounts paid by Buckeye to Plaintiffs will represent recovery for more than its fair share of the claims that Plaintiffs made or could have made in this action and the Third-Party Defendants are liable to Buckeye for contribution under CERCLA Section 113(f), 42 U.S.C. § 9613(f).

228.     By virtue of the above, Buckeye is entitled to contribution from the Third-Party Defendants for the NRD Costs pursuant CERCLA Section 113(f), 42 U.S.C. § 9613(f).

229.    If and to the extent that Honeywell can establish liability against Buckeye, this Court should allocate any response costs among all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate.

## COUNT III

### Contribution Claim Pursuant to Section 1002 of OPA

230.    Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "229" as if they had been set forth herein.

231.    Pursuant to OPA Section 1002, 33 U.S.C. § 2702:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for . . . any removal cost incurred by any person . . . which are consistent with the National Contingency Plan . . . [and] [d]amages for injury to, destruction of, loss of, loss of use of, natural resources, including the reasonable costs of assessing damage.

232.    If Plaintiff is successful in the Underlying Action, Buckeye will incur removal costs constituent with the NCP, as defined in OPA Section 1001(19), 33 U.S.C. § 2701(19), and NRD costs at the Onondaga Lake Superfund Site.

233.    The Onondaga Lake Superfund Site includes navigable waters and adjoining shorelines, as defined in OPA Section 1001(21), 33 U.S.C. § 2701(21).

234.    If the allegations in the Underlying Complaint are found to be valid, all Third-Party Defendants are responsible parties as defined in OPA Section 1001(32), 33 U.S.C. § 2701(32).

235.    If the allegations in the Underlying Complaint are found to be valid, all Third-Party Defendants owned or operated "facilities" from which oil was discharged into the Onondaga Lake Superfund Site, within the meaning of OPA Sections 1001(9) and 1002, 33 U.S.C. §§ 2701(9), 2702.

236.    If the allegations in the Underlying Complaint are found to be valid, Third-Party Defendants' discharges and releases of oil resulted in injury to, destruction of, loss of, and/or loss of use of, natural resources.

237.    If the allegations in the Underlying Complaint are found to be valid, and Buckeye is found liable to Honeywell under OPA, then Third-Party Defendants are liable in contribution to Buckeye under OPA Sections 1009 and 1017, 33 U.S.C. §§ 2709, 2717, for oil-related removal costs incurred consistent with the NCP at the Onondaga Lake Superfund Site.

238.    If and to the extent that Honeywell can establish liability against Buckeye, this Court should allocate any response costs among all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate

## COUNT IV

## Contribution Claim Pursuant to New York Navigation Law

239.    Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "240" as if they had been set forth herein.

240.    Under N.Y. Nav. Law § 181(1), "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained."

241.    If the allegations in the Underlying Complaint are found to be valid, all Third-Party Defendants and their predecessors are "persons" who "discharged "petroleum," as those terms are defined by N.Y. Nav. Law §§ 172(14), (8), and (15), at the Onondaga Lake Superfund Site.

242.    If the allegations in the Underlying Complaint are found to be valid, all Third-Party Defendants' petroleum discharges at Onondaga Lake were into the waters of the State of New York and/or onto lands form which the discharges might flow or drain into those waters.

243.     If the allegations in the Underlying Complaint are found to be valid, Third-Party Defendants' petroleum discharges caused direct and indirect damages to the natural resources of Onondaga Lake.

244.     If Plaintiffs are successful in the Underlying Action, a portion of the costs that Buckeye will incur are direct or indirect damages caused by Third-Party Defendants' petroleum discharges.

245.     N.Y. Nav. Law § 176(8) states: "every person providing cleanup, removal of discharge of petroleum . . . pursuant to this section shall be entitled to contribution from any other responsible party.

246.     "Cleanup and removal" costs include "[t]he cost of restoration and replacement, where possible, of any natural resource damaged or destroyed by a discharge."  N.Y. Nav. Law § 181(2).

247.     If the allegations in the Underlying Complaint are found to be valid, all Third-Party Defendants are "responsible parties under N.Y. Nav. Law § 176(5) with regards to the petroleum discharges at Oil City.

248.     If Plaintiffs are successful in the first-party action, Buckeye will be a "person" that has incurred, and will continue to incur, "cleanup and removal" costs, as that phrase is defined in N.Y. Nav. Law § 172(5), at the Onondaga Lake Superfund Site.

249.     If the allegations in the Underlying Complaint are found to be valid, Third-Party Defendants are liable to Buckeye for contribution of the costs of cleanup and removal of petroleum discharges that Buckeye will incur, should Plaintiffs succeed in the first-party action, with respect to the investigation and remediation of the Onondaga Lake Superfund Site.

250.    If and to the extent that Honeywell can establish liability against Buckeye, this Court should allocate any response costs among all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate

## COUNT V

## Contribution Claim Pursuant to CPLR 1401

251.    Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "252" as if they had been set forth herein.

252.    If the allegations in the Underlying Complaint are found to be valid, by virtue of each Third-Party Defendants' status and/or conduct as alleged hereinabove, each Third-Party Defendant is a tortfeasor.

253.    To the extent that Buckeye is liable to Plaintiffs, any payments and/or response actions taken represent more than its share of the claim that Plaintiffs made or could have made in this action.

254.    If the allegations in the Underlying Complaint are found to be valid and Buckeye is found liable to Honeywell, Buckeye is entitled to contribution from the Third-Party Defendants pursuant to N.Y. CPLR § 1401.

255.    If and to the extent that Honeywell is able to establish liability against Buckeye, this Court should allocate any response costs among all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate.

## COUNT VI

## Contractual Defense and Indemnification Under the Asset Purchase Agreement as Against ExxonMobil

256.    Buckeye repeats and incorporates herein by reference the allegations of contained in paragraphs "1" through "255" as if they had been set forth herein.

257.     Buckeye and ExxonMobil entered into the Asset Purchase Agreement on November 29, 1983 to convey certain pieces of real property from ExxonMobil to Buckeye ("Conveyed Property").

258.     The Conveyed Property had been used by ExxonMobil for decades to store, sell and transfer petroleum products or solvents.

259.     Buckeye fully performed its contractual obligations under the Asset Purchase Agreement.

260.     ExxonMobil represented that discharges of the petroleum products had occurred at the Conveyed Property from time to time prior to the execution of the Asset Purchase Agreement.

261.     As a condition to the Asset Purchase Agreement, ExxonMobil pledged, represented and warranted that it would bear responsibility for any and all claims or actions, "for injuries, death, loss or damage of any kind or character, to person or property by whomever suffered or asserted arising out of spills, leaks or other discharge of petroleum products or solvents for the period of time during which [ExxonMobil] had title to the Project Property."

262.     Here, ExxonMobil owned and operated the Conveyed Property as a petroleum storage facility, upon information and belief, from 1947 up through 1983 and, pursuant to the Asset Purchase Agreement, is responsible for any loss or damages arising from petroleum spills, leaks or discharges which arose during its ownership tenure.

263.     The Asset Purchase Agreement, in paragraph 20(a), continues on to state that,

> Seller shall and hereby agrees to indemnify and defend Purchaser against, and hold Purchaser harmless from, all claims, demands, expenses (including reasonable attorneys' fees), causes of action, and suits of any nature whatsoever arising out of ownership and/or operation of the Project Property prior to the Closing and any and all activities relating thereto (whether any such claims, demands causes of action, or suits are asserted prior to or after the Closing).

264.    Here, Honeywell's claims against Buckeye seek damages which, if and to the extent Honeywell is able to establish them, arise, in whole or in part, from ExxonMobil's ownership of the Conveyed Property and for which ExxonMobil must now, as a matter of contract, defend and indemnify Buckeye.

265.    Thus, if any to the extent that Honeywell is able to establish liability against Buckeye for spills or contamination at Terminal 2, this Court should enter an Order finding ExxonMobil contractually liable to Buckeye for defense and indemnification costs and damages and (i) allocate any response costs to ExxonMobil as is appropriate for its period of ownership of the Conveyed Property; and (ii) enter an award of attorneys' fees to Buckeye from ExxonMobil pursuant to the Asset Purchase Agreement.

**WHEREFORE,** Third-Party Plaintiffs demand judgment against Third-Party Defendants as follows:

A.    If and to the extent that Honeywell establishes liability against Buckeye, that all response costs and/or assessed damages are allocated amongst all liable parties, including Third Party Defendants, using such equitable factors as this Court determines are appropriate under, *inter alia*, CERCLA Section 113(f), 42 U.S.C. § 9613(f);

B.    If and to the extent that Honeywell establishes liability against Buckeye under OPA, that Third-Party Defendants shall be adjudged liable in contribution under OPA Sections 1009 and 1017, 33 U.S.C. §§ 2709, 2717, for their respective proportional share of any assessed damages for oil-related removal costs incurred consistent with the NCP at the Onondaga Lake Superfund Site;

C.    If and to the extent that Honeywell establishes liability against Buckeye under New York Navigation Law, that Third-Party Defendants shall be adjudged liable in contribution for

their respective proportional share of the costs of cleanup and removal of petroleum discharges that Buckeye incurs, or is held liable for, at the Onondaga Lake Superfund Site;

D.     If and to the extent that Honeywell establishes liability against Buckeye, that Third-Party Defendants shall be adjudged liable in contribution pursuant to New York CPLR § 1401 for their proportionate share of all accrued damages;

E.     If any to the extent that Honeywell is able to establish liability against Buckeye for spills or contamination at Terminal 2, this Court should enter an Order finding ExxonMobil contractually liable to Buckeye for defense and indemnification costs and damages and (i) allocate any response costs to ExxonMobil as is appropriate for its period of ownership of the Conveyed Property; and (ii) enter an award of attorneys' fees to Buckeye from ExxonMobil pursuant to the Asset Purchase Agreement and

F.     For such other relief as Buckeye may be entitled to under the applicable statutory, substantive, and procedural law, or that the Court otherwise deems just and proper.

DATED: October 30, 2019          HANCOCK ESTABROOK, LLP

BY:     _____
          John G. Powers, Esq. (Bar Roll No. 508934)
          Wendy A. Marsh (Bar Roll No. 302274)
          James J. O'Shea, Esq. (Bar Roll No. 51640)
          Christopher I. Hall, Esq. (Bar Roll No. 700815)
          1800 AXA Tower I
          100 Madison Street
          Syracuse, New York  13202
          Telephone: (315) 565-4500

          *Attorneys for Third-Party Plaintiffs*